John E. PARKS, Jr., and Robert M. Foote and Albert McHugh and Paul Ziegler and Silvio Stamerro, Individually and as Representatives of the members of Local 28, I.B.E.W., in a Class Action, and Local Union 28, International Brotherhood of Electrical Workers, Appellees and Cross-Appellants,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Appellant and Cross-Appellee.

Local Union No. 24 (IBEW), Intervenor.

No. 8649.

United States Court of Appeals
Fourth Circuit.

Argued June 14, 1962.

Decided Jan. 23, 1963.

Certiorari Denied April 22, 1963.

See 83 S.Ct. 1111.

Soper, Circuit Judge, dissented.

John Henry Lewin, Baltimore, Md., and Thomas X. Dunn, Washington, D. C. (Robert R. Bair, and Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellant and cross-appellee.

George Cochran Doub, Baltimore, Md. (Weinberg & Green, Baltimore, Md., on brief), for intervenor-appellant.

Melvin J. Sykes, Baltimore, Md. (Patrick A. O'Doherty, Baltimore, Md., on brief), for appellees and cross-appellants.

J. Albert Woll and Theodore J. St. Antoine, Washington, D. C., on brief for American Federation of Labor and Congress of Industrial Organizations as amicus curiæ.

Before SOBELOFF, Chief Judge, and SOPER and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

A dispute between an international union and one of its component local unions which led to the revocation of the local's charter and the establishment of a new local embracing its jurisdiction, occasioned two suits against the international. One was brought by the local union and the other by five of its members in behalf of the membership, both suits seeking declaratory judgments and injunctive relief to restore the local to good standing in the international and to obtain incidental relief. The two suits have been consolidated. The revocation action complained of was taken by the International Brotherhood of Electrical Workers (IBEW) after its Local Union No. 28-IBEW (Local 28) went out on strike without obtaining the approval of the IBEW International President (IP) in contravention of the IBEW Constitution and failed to return to work in defiance of his repeated directions to do so. The strike was undertaken by the Local to enforce demands made by it in the course of contract negotiations with the Maryland Chapter of the National Electrical Contractors Association.

The plaintiffs contended below that the IP had no constitutional authority to refuse permission for the strike or to revoke Local 28's charter for disregard of his order. They further contended that even if constitutionally authorized, the action was invalid because: (1) it was in breach of a duty owed to the Local and its members, and was taken in bad faith for improper reasons; (2) the Local was not afforded a fair hearing before a properly constituted tribunal; and (3) the revocation was unjust and an unreasonably severe sanction in the circumstances.

More particularly, the plaintiffs maintained that the IP improperly collaborated with the National Electrical Contractors Association (NECA) during Local 28's collective bargaining negotiations with the Maryland Chapter of NECA; illegally sought to impose a perpetual collective bargaining agreement on the Lo-

cal; and harbored animosity toward the Local and its leadership because of their efforts to maintain local autonomy. Moreover, they asserted that by deciding the charges against Local 28 when his own good faith was called into question, the IP denied the Local a fair hearing— a defect which was not cured by the appellate review of the IBEW International Executive Council.

The International replied that the revocation was justified because by engaging in a strike contrary to the IP's order, Local 28 was in clear violation of the IBEW Constitution; that the revocation was reasonable and necessary to maintain proper union discipline, did not result from improper motives on the part of the IP, and was enforced only after fair procedures provided in accordance with law and the IBEW Constitution. It contended that, in any event, the plaintiffs' claims were barred by their own unclean hands and failure to exhaust intra-union remedies. The defendant also raised serious jurisdictional defenses.[1]

The District Judge, after hearing evidence and argument for twenty-two days, held that the strike did require approval of the IP. He further held that there was no sufficient evidence that the IP had been moved by "express or particular malice, i. e. ill-will, spite, a grudge, or a desire to be revenged on a particular person or persons, resulting in a deliberate intention to commit an injury." 203 F.Supp. at 309. Nevertheless he concluded that the IP had acted from "mixed motives" amounting to "legal malice" in forbidding the strike and in revoking the charter. With respect to the fairness of the hearing and the severity of the discipline, the Judge upheld the plaintiffs.

The decree ordered the restoration of the charter of Local 28 and all appurtenant rights and privileges. It enjoined any retrial or future charges against that Local for any past conduct involving the issues in the instant cases, but did not preclude the proper officials of the defendant from pressing charges for such past misconduct against certain members who were the ringleaders in defying the IP's order forbidding the strike. The decree expressly did not enjoin disciplinary action for breaches of the defendant's Constitution occurring after the decree, including continuation of the present strike after reasonable notice from the IP "issued with proper motives." The charter of Local 24, which was organized by IBEW to take over the jurisdiction of Local 28, was ordered revoked. The plaintiffs' claims for damages and counsel fees were denied.

From the order of the District Judge for the restoration of the charter of Local 28 and the revocation of the charter of the newly created substitute, Local Union No. 24, the International appeals. From the denial of additional relief requested by the plaintiffs, they appeal. Local 24 has intervened on appeal claiming that as it was not a party to the ac-

1. The two cases rest on separate legal bases, although the same events are relied on as grounds for relief. The individual members' action, Parks, et al. v. IBEW, was brought under §§ 101, 102, 302, 304, 609 of the Labor-Management Reporting and Disclosure Act (LMRDA) of 1959 (29 U.S.C.A. §§ 411, 412, 462, 464, 529) for injunctive relief and a declaratory judgment that revocation of the charter constituted unreasonably severe discipline of the members without a fair hearing, and also amounted to institution of a trusteeship over the Local. The District Judge ruled for the plaintiffs on the first ground, but found no evidence that the revocation was used as a means of circumventing the Act's trusteeship limitations. The Local's action, Union No. 28-IBEW v. IBEW, was instituted under § 301(a) of the Labor Management Relations Act (LMRA) (29 U.S.C.A. § 185(a)) on the grounds that the IBEW Constitution was a "contract * * * between * * * labor organizations" within the meaning of that section, and that the IP's actions amounted to a breach of that contract entitling the Local to injunctive relief and damages. The District Judge granted injunctive relief but denied damages and counsel fees.

tion in the court below, that court's decree could not alter its status.

## I. FACTS

The nature and complexity of the issues raised require not only close examination of the proximately operative facts, but also of the context in which the dispute developed. Particularly is it necessary to study the relationship, within the electrical contracting industry, of the IBEW with its component local unions and individual members, and with the principal employers' association, NECA. One cannot decide the issue of "breach of duty owed the Local and its members" without first considering carefully what were the respective duties resting in the IP, the Local, and its members.[2]

*Organization and Structure of the IBEW*

The IBEW, one of eighteen members of the AFL-CIO Building and Construction Trades Department, is about seventy years old and has 750,000 members organized into almost 1800 component local unions. About 150,000 of these members work in the electrical construction industry. These belong to locals in the United States and Canada having about 800 working agreements with chapters of NECA and a few other employer associations.[3]

Local 28 received its charter from the IBEW in 1900, and through the years it has served as the uncertified bargaining representative for its members. As of June 1, 1961, it had about 1400 members, most of whom were employed in the electrical construction industry in Baltimore City and the ten nearby Maryland counties. As authorized by the IBEW Constitution, it includes among its members supervisory and managerial personnel who are restricted from voting or attending meetings. (IBEW Const. Art. XVII, § 6). See § 14(a) of the LMRA, 29 U.S.C.A. § 164(a).[4] The Local operated a hiring hall and provided a local pension and other benefit funds. Its welfare assets amounted to between one-half and three-quarters of a million dollars.

The organizational structure of the IBEW and the relations, rights and duties therein are pervasively governed by the International Constitution.[5] The International Convention (IC), comprised of representatives of the locals, is the ultimate governing body. During intervals between conventions control is in the International Executive Council (IEC),

2. In addition to the District Court's decision now under review, reported as Parks v. IBEW, 203 F.Supp. 288 (D.Md. 1962), there have been several earlier District Court opinions that bear upon the present case. See Executive Board, Local Union No. 28, IBEW v. IBEW, 184 F.Supp. 649 (D.Md.1960); Local Union No. 28, IBEW v. Maryland Chapter, National Electrical Contractors Ass'n, Inc., 194 F.Supp. 491; 194 F.Supp. 494 (D.Md. 1961); Local Union No. 28, IBEW v. IBEW, 197 F.Supp. 99 (D.Md.1961).

3. NECA is a national association of employers in the construction industry; it is comprised of local chapters representing electrical contractors in particular geographic areas for purposes of collective bargaining. Some contractors who are not members also designate NECA or an area chapter as their collective bargaining agent.

 The Maryland Chapter represents 26 electrical contractors doing approximately 80% of the major construction in and around Baltimore; over the years the Maryland Chapter has negotiated successive collective bargaining agreements with Local 28.

 NECA offers advice and assistance to its chapters in collective bargaining matters. For years NECA and IBEW have conferred on a national level to further their common interest in stabilizing labor relations in the electrical construction industry. The principal vehicle for advancing this common purpose is the Council on Industrial Relations for the Electrical Contracting Industry of the United States and Canada. (CIR or Council).

4. Its leadership includes *former* supervisors and contractors to whom these restrictions do not apply. The inclusion of such active members in a union is not illegal, and is traditional in this industry.

5. Many of the material provisions of the Constitution are set forth in 197 F.Supp. at 102 n. 2.

composed of nine members meeting quarterly, the International President and subsidiary officers.

Actually, effective control of IBEW activities is entrusted to the IP who, since 1955, has been Gordon M. Freeman. He is empowered to decide all controversies including questions of law (Art. IV, § 3 (2)); to remove International officers for cause and to fill vacancies by appointment (Art. IV, § 2); to enter into agreements with national or international labor organizations or associations of employers, or with companies doing an interstate business in electrical work to cover the entire jurisdiction of the IBEW (Art. IV, § 3(12)). "The I.P. can, in any situation, delegate the powers of his office to an International Representative, Vice-President or Assistant." (Art. IV, § 4). He may also appoint "a referee who may or may not be a member, to take testimony and report to him." (Art. IV, § 3(11)).

The IP's authority over local unions is notably extensive. (See Art. IV, § 3(8), (9), (10); Arts. XV & XVII). Locals receive their charters only upon his authorization. (Art. XV, § 1). He assigns the locals their jurisdiction, can merge or amalgamate locals or suspend or revoke a local's charter if it does not organize or protect its jurisdiction. (Art. XV, §§ 2–4). In addition, when necessary to protect or advance the interests of its members, the IP can take charge of the affairs of any local, (Art. IV, § 3(9)); he can also remove or suspend local officers for various reasons. (Art. IV, § 3 (10)).

Locals may not affiliate with central labor councils and the like without his permission. (Art XVII, § 5). Although locals are empowered to make their own bylaws and working rules, these are null and void if they conflict with the International Constitution.[6] And all bylaws, amendments and rules and all agreements of any kind are null and void unless approved by the IP who has the right to "correct" them to conform to the IBEW's Constitution and policies. (Art. XVII, §§ 7–9). In addition, no agreement can be abrogated without his approval. (Art. XVII, § 11); and no general work stoppage can be undertaken without his consent and "[t]he I.P., or his representative, has the power at any time to enter any situation or controversy involving a L.U. [Local Union] or any of its members, and the decision of the I.P., direct or through his representative, shall be accepted by the L.U. and its officers, subject to appeal to the I.E.C. and I.C." (Art. XVII, § 13). By way of ultimate enforcement sanction, the IP is empowered:

> "Either to suspend or revoke the charter of any L.U., or have the I.S. [International Secretary] reject the per capita tax from any L.U. that fails or refuses to observe the laws and rules of the I.B.E.W." (Art. IV, § 3(8)).

The Constitution provides that acceptance of an application for membership and admission to a local union constitutes a contract between the member, the local, the IBEW and all other members. (Art. XXII, § 3). Each new member is required to take an oath of allegiance to the IBEW and to conform to its Constitution and laws. (Art. XXII, § 4). A member may be penalized for violating the IBEW "Constitution and the rules herein, or the bylaws, working agreements, or trade and working rules of a L.U." or for "working in the interest of any organization or cause which is detrimental to, or opposed to, the I.B.E.W." (Art. XXVII, § 2(2), (9)). The IP is empowered to file charges against a member before the IEC. (Art. IV, § 3(7)).[7]

---

6. Questions of conflict are necessarily decided by the IP who is empowered to decide all questions of law. (Art. IV, § 3 (2)).

7. Provision is also made for automatic expulsion of a member or a local for resorting to a court of law without having fully exhausted internal remedies. (Art. XXVII, § 1 and Art. XVII, § 1). Even advising such resort is penalized. (Art. XXVII, § 2(1)). The legality of some of these provisions, in the face of §§ 609

All decisions of the IP are subject to appeal, first to the IEC, meeting quarterly, and then to the International Convention, meeting every four years. (Art. IV, § 3(2)). The IEC is also empowered to try local unions or members, and may revoke or suspend charters or memberships. (Art. IX, § 4; see also Art. IX, § 6). No appeal is recognized unless there is compliance with the decision from which the appeal is taken and all appeals must be taken within 30 days of the decision which is being appealed. (Art. XXVII, §§ 16, 17).

### The Council on Industrial Relations (CIR or Council)

The Council, a bipartite body consisting of NECA and IBEW representatives, was founded in 1920 by the IBEW and a predecessor employers' association. It consists of 12 persons, six representing each member organization, and additional alternates to assure the presence of at least four representatives of each organization at its quarterly meetings. There is a co-chairmanship of the chief executive of each organization; at all times pertinent to this case the co-chairmen have been Gordon Freeman, IP of the IBEW, and Paul M. Geary, Executive Vice-President of NECA.

While not strictly an arbitration body, primarily because the Council contains no neutral outsiders and exercises the power to alter the terms of agreements between IBEW locals and NECA chapters in its discretion, the Council functions to render final and binding decisions on collective bargaining issues submitted to it when local negotiations have reached an impasse. Its decisions must be unanimous, each representative voting separately. Although most disputes are decided upon submission of both parties, unilateral submissions are accepted when the collective bargaining agreement contains a Council clause and the submitting party has attempted in good faith but failed to effect a local settlement and has notified the other party of its intention

to file and invited it to join the submission. Council decisions are reached in executive session after hearing argument and no final decision is reached until the Council adjourns, when the parties are simultaneously notified of the Council's action.

The Council's principal purpose is "to remove the causes of friction and dispute in the electrical contracting industry" by providing a forum for conciliation and settlement of controversies between IBEW locals and NECA chapters. It has aided in creating a relatively "strikeless" climate within the electrical construction industry, and it is undisputed that by and large it has served the parties well over the years.

### Council Clauses

With the encouragement of the two national organizations, IBEW and NECA, most collective bargaining agreements between IBEW locals and NECA chapters contain some form of Council clause. There are variations, but generally clauses require submission to the Council for binding decision of all disputes arising during the term of the agreement and proposed changes at the end of any contract year when the parties fail to arrive at an agreement locally.

Most Council clauses have in the past provided that the agreement was to run from year to year "unless changed as * * * provided" in the agreement. It had been generally assumed that such contracts were "evergreen," that is, it was considered that they were terminable only upon mutual consent of the parties or permission of the Council and that a unilateral attempt to terminate would be a dispute to be referred to the Council.

In August, 1959, NECA circulated to its chapters copies of a uniform Council clause, referred to in the evidence as the "yellow sheet" clause because it was printed on yellow paper. This was unambiguous in its "evergreen" character and specified that it was to "continue in effect from year to year * * * unless

and 101(a) (4) of the LMRDA, 29 U.S. C.A. §§ 529 and 411(a) (4), might be

difficult to defend. See § 101(b) of the LMRDA, 29 U.S.C.A. § 411(b).

*changed or terminated* in the way later provided herein. \* \* \* Notice by either party of a desire to *terminate* the agreement [would] be handled in the same manner as a proposed change." (Emphasis added.) In 1956 the Council had adopted a policy of requiring the inclusion of "evergreen" Council clauses "where the matter of the Council agreement was in dispute." The District Court found that the IP had not made this policy known to the local unions or all the other International officers. It is undisputed that both the IBEW and NECA favor the inclusion of the broadest possible Council clauses in collective bargaining agreements between IBEW locals and NECA chapters.

Actually, only 20 of the some 800 collective bargaining agreements between IBEW locals and NECA chapters contain the "yellow sheet" "evergreen" clause. Eighteen of these were imposed by the Council itself; only two originated in local negotiations. Controversy over the meaning of the particular Council clause in the 1958 agreement between Local 28 and the Maryland Chapter, over inclusion of the recommended "yellow sheet" Council clause in their new agreement and over the legality of such a clause, forms a significant part of the present dispute.

### Relations Between Local 28 and the International Prior to 1961

Since it is part of the plaintiffs' theory that the IP was unlawfully motivated in his actions, particularly by alleged ill-will originating in earlier misunderstandings between IBEW and Local 28, we turn now to those events.

Since 1958 two factions, one led by Eveson and Beckhardt and the other by King and Rost, have vied for control of Local 28. Although in the summer of that year Eveson was elected President, King was re-elected Business Manager

and Rost, Financial Secretary. In September, 1958, Eveson, acting within the Local, attempted to bring its financial policies into line with its bylaws. When orders of Local 28's Executive Board supporting Eveson's efforts were ignored, he preferred charges against King and Rost by letter of January 26, 1959, addressed to IBEW Regional Vice-President Blankenship. On January 31, 1959, he requested an investigation by the IEC. On February 9, 1959, the IP sent International Representative Goidel to confer with the officers of the Local. Goidel imposed a trusteeship.[8] Thereafter he removed Eveson from office, but retained King and Rost, and suspended the Local's bylaws and the meetings of the Executive Board and general membership.

Among other acts objectionable to the local membership, Goidel, in a referendum on November 17, 1959, made two proposals relating to dues and assessments. The first involved a substantial increase in dues and the second the elimination of certain existing benefits. Over 75% of the members abstained from the balloting. On December 11, 1959, seven members of the Local, the present leadership, without first exhausting their internal remedies, filed suit in the federal District Court of Maryland to enjoin certification of the result of the referendum. About that time the IP mooted the cause by refusing, because of the paucity of the vote, to accept the result of the referendum.

In March, 1960, Goidel, with the help of the IBEW General Counsel, filed charges with the IEC against the members who had brought the suit in December, 1959. Their failure to exhaust internal remedies was the basis of the charges. On March 22, 1960, the Executive Board of Local 28 responded by

---

8. On October 14, 1959, in accordance with the requirements of § 301 of the LMRDA, 29 U.S.C.A. § 461, the International filed an initial trusteeship report with the United States Department of Labor stating that the trusteeship had been imposed because "the factionalism in the Local Union has prevented the officers thereof from properly organizing the electrical industry within the jurisdiction of the said Local Union."

suing in the District Court, under Title III of the LMRDA, 29 U.S.C.A. §§ 461–466, to set aside the trusteeship.[9] The members of Local 28, against whom Goidel had filed charges, sued in the same court to enjoin the International from proceeding upon those charges.

Again the International mooted these cases.[10] There is no evidence of further difficulties between the International and Local 28 from August, 1960, to March, 1961.

### Local 28 and the Maryland Chapter Contract Negotiations

Over the years Local 28 and the Maryland Chapter negotiated a series of contracts containing Council clauses. The most recent of the series was agreed upon on March 7, 1958, and was duly approved by International President Freeman. It provided that it should take effect April 1, 1958, and remain in effect through March 31 of each succeeding year unless changed as provided therein; that notice specifying proposed changes must be submitted at least 60 days prior to April 1 of the contract year; that there should be no stoppage of work because of any proposed changes; and that the original agreement should remain .in effect until all proposals had been satisfactorily resolved. The contract directed that matters in dispute, which the local negotiators failed to resolve, should be referred to the Council whose decision would be "final and binding on both parties." [11]

From 1922 to 1958 no dispute with respect to wages had been submitted to the Council by Local 28 or the Maryland Chapter. In 1958, 1959, and 1960 wage and related disputes were referred to the Council, which granted Local 28 hourly wage increases of 15¢, 17½¢, and 10¢ in these three years, respectively. The court below found, and it is not contested, that. the increases granted were "not unfair or unreasonable under all the circumstances." 203 F.Supp. at 299.

The form of "Council clause" in the 1958 agreement provided for submission of "proposed changes" to the Council but, unlike some clauses prior to 1955, did not refer to termination. Taking the position that the contract was unilaterally terminable at the end of any contract year, Local 28, on January 12, 1961, notified the Maryland Chapter in writing of its intention to terminate the existing contract in the event that it could not be modified to the mutual satisfaction of the parties.[12]

In the ten meetings that followed between February 6 and March 31, the parties remained far apart. Local 28 firmly insisted on a two-year contract, a 35¢ per hour increase the first year and a 30¢ increase the second, or alternatively a one-year contract with a 35¢ wage increase. At times during the

9. On May 11, 1960, Judge R. Dorsey Watkins denied a motion to dismiss this complaint. Executive Board, Local Union No. 28, IBEW v. IBEW, 184 F.Supp. 649 (D.Md.1960).

10. On September 16, 1960, the IEC unanimously recommended that no action be taken on the charges filed by Goidel. The reason stated was that there was confusion as to the meaning of the recently enacted LMRDA in regard to its effect on the doctrine of exhaustion of internal remedies and the accused men had acted on information received from a Labor Department official.

In addition, elections were held within Local 28 in July, 1960; Eveson was re-elected President and Beckhardt was elected Business Manager in the place of King. On August 5, 1960, the IP unconditionally terminated the trusteeship pursuant to his earlier order dated June 30.

11. Provisions of this contract are more fully set forth in Local Union No. 28, IBEW v. Maryland Chapter, National Electrical Contractors, Ass'n, 194 F. Supp. 494, 495–496 (D.Md.1961).

12. Consistent with this stand, and in fulfillment of its statutory obligation, § 8 (d) of LMRA, 29 U.S.C.A. § 158(d), on February 24, Local 28 also sent a "Notice to Mediation Agencies" to the federal and state agencies, notifying them that a dispute existed concerning the collective bargaining agreement, and of the proposed termination of the agreement.

negotiations the Local proposed a three-year contract—"35¢ for the first year and * * * comparable amounts for two years thereafter." 203 F.Supp. at 299. Such increases were claimed to be necessary to bring the union wage in Baltimore into line with the wage rates in Washington, Philadelphia, Wilmington and other large nearby cities. The Maryland Chapter, on the other hand, initially offered only 2¢ per hour more for each year. This offer was raised on March 27 to 5¢ per hour in return for a reduction in the number of paid holidays demanded by the union. The Chapter insisted that this was as much as was economically feasible in view of the strong competition of non-union contractors in Baltimore. The relative weakness of union labor in the Baltimore market made it unreasonable, said the Chapter, to insist on wage scales here comparable to other cities where union contractors do not face stiff non-union competition. The Maryland Chapter further contended that the contract could not be terminated unilaterally without Council approval.

Local 28, afer notifying the Maryland Chapter of its intention to do so, brought an action on March 28, 1961, in the District Court for a declaratory judgment upholding its right to terminate the agreement as of April 1, 1961. On March 31 it notified the Chapter that it considered the agreement terminated. Thereafter, local bargaining sessions were temporarily suspended.

These developments were brought to the attention of the membership in a meeting of Local 28 on April 1, 1961, at which time the members were cautioned by Business Manager Beckhardt "to prepare yourself economically for the worst" but not to take any "action yourself that will embarrass yourself or the Union" as a strike prior to decision in the declaratory judgment suit might endanger the assets of the Local. The International learned of these occurrences in correspondence from Beckhardt to International Vice-President Blankenship, and through a meeting on April 11, between International Representative Frank Adams, who had been sent to Baltimore to assist in negotiations when NECA sent a representative to aid the Maryland Chapter, and officers of the Local. The International was also informed of the Local's demand for an immediate 35¢ wage increase and of its intention to strike if necessary to achieve it.

The District Judge found that the Local reasonably believed it had the support of the International in its efforts to obtain a substantial increase. This finding is apparently based on the correspondence between Beckhardt and IVP Blankenship. Precisely what Blankenship wrote was: "I assure you that Local Union 28 will have my support as well as any other IBEW Local Union that is consistent with the working agreement, *IBEW constitution and policy* and Federal and State laws." (Emphasis added.) Moreover, as the court also found, International Representative Adams told the Local in April that in its wage demands it was "shooting for the moon."

While its International Representative was attempting to assist Local 28 in the negotiations, IBEW was conferring with the Maryland Chapter and with NECA in the first of several meetings concerning the litigation commenced by the Local. Thus, on April 7, 1961, Louis Sherman, General Counsel for IBEW, met with James P. Garland, attorney for the Maryland Chapter, and with other representatives of the Chapter and of NECA, at the Washington offices of NECA to obtain information on the status of the case and the legal issues involved. The testimony establishes that an underlying purpose was to determine whether IBEW or the Council should intervene in the litigation. One of the complaints of the Local is that it was not currently informed of these meetings.

On April 17, 1961, the Chapter's motion to dismiss the action against it was denied, see 194 F.Supp. 491; on April 21, the Chapter formally invited the Local to join in the submission of issues

to the Council and notified the Local that otherwise it would do so unilaterally; and on April 28, the Chapter filed its case before the Council, presenting all issues previously exchanged between the parties, including the issue of "termination of the contract."

In the meantime, on April 25, without a formal strike vote, and without having sought or received permission to strike from the IP, about half of the members of Local 28 went out on strike. Ostensibly a wild cat strike, the District Judge found that it was in fact subject to the control of Eveson and Beckhardt, and of O'Doherty, Local 28's attorney.[13]

Collective bargaining between the Local and the Chapter was resumed on April 27, and the Council scheduled a hearing for May 15 on the issues submitted by the Maryland Chapter. On May 4 Local 28 filed another suit in the District Court to enjoin any decision by the Council based on the unilateral submission. This suit was consolidated with the earlier declaratory judgment action against the Maryland Chapter and a hearing was held on May 10 and 11. At its conclusion the District Judge orally announced his decision that the Local had the right to and did effectively terminate its agreement on March 31, 1961, as the terms of the agreement did not require the issue of termination to be submitted to the Council. The court intimated, without finding it necessary to decide, that if the contract were construed to be perpetual it would be invalid. Opinion, May 16, 194 F.Supp. 494.

At the court's suggestion, the parties agreed to continue to bargain in good faith, the Maryland Chapter agreed to take any appeal promptly, and the Local Union agreed with the concurrence of the large number of its members in the courtroom to return its members to work and to remain at work until a decision of the Court of Appeals was rendered "or until July 31, 1961, if no appeal is taken." 194 F.Supp. at 502. The court further suggested that the parties voluntarily submit their differences to the Council for conciliation, refusing either to require arbitration as requested by the Chapter or to enjoin the Council from rendering a decision as requested by the Local.

Thereupon, the members of Local 28 returned to work. The local negotiators resumed their meetings on May 13. There was discussion of a possible wage increase of 50¢ over a three-year period, an amount substantially higher than the last offer on May 5 which had been 5¢ for 1961, 5¢ for 1962, and 10¢ for 1963, a total increase of 20¢ under a three-year contract otherwise unchanged. By letter of May 14, Beckhardt reported to Freeman that management was coming up with "far more substantial offers."

On May 15, the Maryland Chapter's submission came on for hearing before the Council. Local 28 did not appear, but sent a letter to the Council setting forth its reasons and accusing the Chapter of not bargaining in good faith. The Chapter representatives informed the Council of the court's ruling of May 11, and requested that no binding determination be reached but that the Council confine itself to an advisory opinion. There is evidence that Freeman became angry and ordered the Chapter to proceed with its case.

After the hearing, the Council met in executive session for an hour and a half. The District Court found, on conflicting evidence, that a tentative decision was reached with the approval of the IP allowing a 10¢ per hour wage increase. The existing contract was to remain otherwise unchanged. At this particular stage, apparently, there was no insistence on an "evergreen" clause. Final action, however, was deferred and on June 2 the Council announced that in view of the pending litigation no decision would be issued.

13. Other than to note its surprise, the Local makes no effort to contest this finding, except to point out that the finding was not that the strike was *caused* by the Local's leadership.

In the meantime, on May 18, the negotiating committee met and management again increased its offer—10¢ for 1961, 10¢ for 1962, and 5¢ for 1963. Though the Chapter's new offer of 10¢ for 1961 coincided to that extent with the Council's tentative decision of May 15, the District Judge found as a fact that Local 28 had failed to prove that knowledge of the tentative decision reached the Chapter.

The Chapter promptly noted its appeal from the judgment of the District Court in the declaratory judgment case. Thereafter, sometime before June 2, Freeman and Geary (the NECA chief executive) conferred; Geary stated that he was recommending dismissal of the appeal, and Freeman assured him that he would do all that he could to see that Local 28 would submit to the Council all issues, concerning a new contract, which were not resolved on a local level. At a further meeting on June 2 in Sherman's office between him, Geary and the attorneys for NECA and the Maryland Chapter, it was decided that the appeal should be dismissed. Shortly thereafter, Geary sent a representative to advise the Maryland Chapter with respect to its negotiations, particularly to ask for the Council's recommended "yellow sheet" Council clause. At the next bargaining session on June 5, the Chapter's proposed terms for a new one-year contract were a 10¢ wage increase plus the "yellow sheet" Council clause.

### The June Strike

The Maryland Chapter dismissed its appeal on June 9. Local 28 held a strike meeting on June 13. Answering a question from the floor as to whether the IP had consented to the strike, Business Manager Beckhardt falsely answered that the Local had been given the "green light." The vote was 740 to 79 in favor of a strike to begin June 16. By telegram of June 14, the Local notified the IP of the strike, adding, "Any instructions from you would be appreciated."

The IP's telegraphic reply of June 15 advised that a strike without his consent would be a violation of the Constitution. He reminded the Local that in the recent case against the Maryland Chapter it was agreed that the members of the Local Union would return to work and continue working until decision on appeal or until July 31 if no appeal were taken. The parties, he added, had agreed to continue bargaining in good faith. He noted that the Chapter's appeal had been dismissed, and that it had been agreed that the members would "continue at work during collective bargaining * * * until July 31, 1961." He refused his consent to a strike or other work stoppage, and instructed the officers to permit no such strike. The reasons he gave for his refusal were that the Local was violating the suggestions of the court, that it had not asked permission to strike in advance, that it was the general policy of IBEW to favor reference of all collective bargaining disputes to the Council when the agreement contained a Council clause, and that he felt that a Council clause could be negotiated which would be acceptable to both parties.

The IP's telegram was received before the strike began, but the local officers did not then inform the members. The telegram was discussed at a meeting of the Local's Executive Board on June 16. A meeting of the membership was called for June 22, and in the meantime, on June 19, the strike was allowed to begin. On June 19, the Local answered the IP by telegram, and the next day its officers met him in Washington. In justification of the strike, it was argued to Freeman that the Local's agreement with the court was to work only until an appeal was taken and decided, and that the appeal had been taken and dismissed; that the Maryland Chapter was not bargaining in good faith in insisting on a perpetual Council clause; that on account of this the Local was filing charges with the NLRB; and that Local 28 had good hopes of success and had already signed up a few individual contractors at the 35¢

figure.[14] The local officers also contended that this was not a general work stoppage within the constitutional prohibition.

Freeman again refused to consent to the strike. He wished the Local success in its negotiations, but repeated that he wanted issues which the parties were unable to resolve to be referred to the Council. He said he would do nothing until the meeting of the Local called for June 22, and the Local's officers, though refusing to promise to send the men back to work, agreed to read the IP's telegram to the members at that meeting.

The meeting of June 22 was attended by an International Representative sent by Freeman. Local 28's attorney, O'Doherty, read the IP's telegram and addressed the members at length. He expressed disagreement with the IP's interpretation of the IBEW Constitution and criticised the International and the Maryland Chapter. O'Doherty called for a vote of "non-concurrence" with the IP which was overwhelmingly given.

Meetings of the local negotiators had been held on June 12. On June 16 and 17 they met before a Federal Mediator, and there were additional meetings in June but no satisfactory accord was reached. Local 28 would not recede from its demand for a 35¢ wage increase for 1961 other than to offer to split its demand by accepting 10¢ April 1, 10¢ August 1, and 15¢ December 1, 1961. The Maryland Chapter, on the other hand, while raising its offer on June 16 to a 20¢ increase for 1961 as part of a three-year contract, insisted on a "yellow sheet" Council

clause which was unacceptable to the Local. Collective bargaining ceased on July 6, when the Maryland Chapter broke off negotiations.[15]

### The Charter Revocation

After Local 28 voted to disobey the IP's order not to strike, Freeman never waivered in his determination to assert the authority of the International and to terminate the unauthorized strike.

Shortly after the strike began, he gave Geary his assurance that he would do whatever he could to obtain other union employees for the NECA contractors, and some men were brought to Baltimore to work. He also informed other unions in the building trades that Local 28's picket lines need not be honored. On June 23, he notified Local 28 that he was sending International Representative Alfred Terry to investigate the work stoppage. Terry arrived in Baltimore on June 23 clothed with authority to investigate not only the strike but also the possibility of establishing a new local in Baltimore. On the 26th he met with officers of the Local, and on the 28th sent the IP a memorandum reporting on the Local leadership's attitude and its request that the IBEW stay out of the situation.

On June 23, O'Doherty wrote Freeman reiterating the Local's position and asking for International support. Freeman's reply on July 7 characterized the Local's action as a challenge to the authority of the IBEW, and he informed O'Doherty that charges had been filed against the Local. The same day the

14. These agreements providing for a 35¢ wage increase were subject, however, to the condition that the Local would refund the difference between that figure and any lesser amount ultimately agreed upon with the Chapter.

15. Local 28 filed charges on June 19 before the NLRB accusing the Maryland Chapter of bargaining in bad faith in insisting on a perpetual contract. This charge was dismissed without prejudice on July 6, after the Chapter took the position before an NLRB examiner that it wanted such a contract but was not insisting on it. The same day, the Chap-

ter, at the suggestion of its attorney and of the NECA Eastern Regional Director, broke off collective bargaining negotiations, charging Local 28 with failure to bargain in good faith. On July 27, Local 28 filed charges against the Chapter and two of its member contractors alleging coercion of members, and on October 3, 1961, charged the Chapter before the NLRB with a failure to bargain in good faith from April 4, 1961. The plaintiffs' counsel have attested in their brief that the Labor Board has suspended its proceedings on these charges pending the disposition of the current litigation.

International served on Local 28 an order, prepared by IBEW counsel and signed by Freeman, requiring it to show cause before an independent referee on July 17, why its charter should not be revoked for engaging in a strike in violation of Art. XVII, § 13 of the IBEW Constitution.[16] The specific charges related to the strikes of June and of April 25 to May 16. The referee was appointed pursuant to Art. IV, § 3(11) of the Constitution to take testimony, make findings of fact, and report to the IP, but Freeman reserved to himself all questions of law as well as the ultimate decision.

Freeman and Sherman met with Beckhardt and O'Doherty on July 12 in Washington at the latter's request. The Local indicated its unwillingness to go to the Council and its fear that a continuous "yellow sheet" Council clause might be imposed upon it by the Council, and suggested that the terms of a new contract be referred to independent arbitration. This offer Freeman rejected, stating: " * * * if we are going to have arbitration, why not take advantage of existing machinery that has proven satisfactory for a number of years?" He refused to assure the Local that it would not be required to accept the "yellow sheet" clause.

Although during examination of the IP the District Judge appeared to assume that the Local had knowledge, at the time of this meeting, of the Council's policy of imposing an "evergreen" clause when the issue of termination came before it, in his decision he found that the IP did not then inform the Local of this policy. However this may be, it is clear that the IP insisted that the Local must return to work and submit all unresolved issues to the Council to avoid disciplinary action.

Prior to the hearing before the independent referee, the Local requested the right to examine the IP and certain other International officers, but Freeman refused to appear because "in the final analysis [he] would have to make a decision in the case." The charges were prosecuted by IBEW General Counsel Sherman, but were limited to the strike of June 16, as Sherman withdrew the charges relating to April "for the purpose of expediting the proceeding." On July 25, the referee reported his findings to the IP that the Local had gone out on strike on June 19 and continued the strike without requesting or receiving consent of the IP, that this was a work stoppage requiring the IP's permission, that by his telegram of June 15 the IP had refused his consent, and that this fact was known in sufficient time to have canceled the strike.

After hearing argument from O'Doherty and Sherman on July 28, the IP indicated his view that Local 28 was in violation of the Constitution, but deferred his decision pending further review. His decision, prepared with the advice of the General Counsel, Sherman, and rendered on August 1, concluded that Local 28 had deliberately and willfully violated the IBEW Constitution. He ordered the Local's charter revoked, its jurisdiction transferred to a new local union, and appropriate legal steps to collect and administer or distribute the Local's assets and trust funds. He directed that the order should take effect on August 7, unless, in the meantime, the members took anew the IBEW Oath of Obligation, terminated the strike, and agreed to refer all unresolved collective bargaining issues to the Council for final and binding decision. His direction added, "it being understood that the Local shall not be required to accept the Council clause ruled terminable by Chief Judge Thomsen [in the Local 28, IBEW v. Md. Chapter, National Electrical Contractors Ass'n case] decided May 16,

---

16. Copies of this order were sent to each member of Local 28 on July 7 together with copies of the correspondence between the IP and O'Doherty. On July 14, Freeman wrote another letter to each member. He included a copy of the Constitution and explained the effect revocation would have on them. He further explained their obligations to the International and assured them that the Local could not validly discipline them for returning to work.

1961." [17] Copies of the order were mailed to all members of Local 28, with a letter from Freeman explaining the action that must be taken to comply, and the consequences to the Local and its members of failure to comply.

On August 2, Local 28 noted its appeal to the IEC from the IP's decision. On August 5, by a vote of 991 to 2, its members supported the officers in their defiance of the IP's order.

Meanwhile, on July 17, while the independent referee's hearing was in progress, Local 28 filed an action in the District Court against the IBEW and the IP alleging breach of the IP's duty to the Local in the course he was following regarding the strike, and that his intent was to require the Local to surrender its autonomy. The District Judge refused to issue a preliminary injunction. He found that no denial of procedural due process had been shown by any fact alleged or presented at that time, and that it had not been demonstrated that the appeal taken by Local 28 to the IEC would be futile, delayed or otherwise unreasonable. He dismissed the complaint "without prejudice." Local 28, IBEW v. IBEW, 197 F.Supp. 99. On August 14, the individuals' complaint was filed in the District Court in Parks, et al. v. IBEW.

On September 12, 1961, Local 28's appeal to the IEC was heard. Counsel was allowed to present argument and read from depositions of Freeman and Geary with respect to the IP's good faith in revoking the charter. After supplemental briefs were filed, the IEC, on September 30, affirmed the IP's order in every particular, holding "beyond question" that the IP had conducted himself properly in revoking the charter. The District Court refused to find that the IEC was preju-

diced. The reinstitution of legal action by Local 28 followed on October 18.

### Local 24

During July, before the revocation, International Representative Terry remained in Baltimore making himself available to the members of Local 28 to explain the position of the International with regard to the strike. On August 27 a charter was granted to Local 24. The initial membership, numbering about 30, adopted bylaws and elected temporary officers. It included a number of Local 28 members who had been supervisory personnel and officers of key members of the Chapter, but who had resigned their offices in their companies. When permanent officers were elected, however, several hundred men had joined Local 24.

In September, an agreement was reached between Local 24 and the Maryland Chapter for a 25¢ wage increase for each of two years. This agreement originally contained the continuous "yellow sheet" Council clause, but it was deleted by IP Freeman who testified that he did so to make the contract accord with the court's earlier ruling. On October 27, Freeman wrote to each member of Local 28 stating the IBEW position that members transferring to Local 24 would not lose their interest in the funds of 28.

As of March 31, 1962, Local 24, which was an open union accepting all applications for membership from qualified electricians, had some 1300 members, of whom 240 had transferred from Local 28. Local 28 was a "closed union," limiting membership to increase the employment opportunities of its members.[18]

### II. LEGAL DISCUSSION

■ Although courts are generally reluctant to interfere in internal union

---

17. The text of this order is set forth in 197 F.Supp. at 104 n. 4.

18. The District Judge found that Local 24 had been from its inception and continued to be dominated by the International. On appeal Local 24 argued that encouragement and aid in its establishment was an appropriate exercise of the International's function.

The District Court found that two leading contractors of the Maryland Chapter had cooperated with Terry in the formation of Local 24. On appeal Local 24 argues that this finding and any legal consequences are matters within the exclusive purview of the NLRB. .

matters, at common law they have, nevertheless, established various norms to determine the legality and fairness of union disciplinary action. Professor, now Soliciter General, Cox has commented that a number of broadly procedural requirements have been imposed upon union action by the state courts.[19] As the District Court found, the few published decisions touching upon issues involved in the revocation or suspension of a local union's charter have generally taken the view that the procedural requirements governing the expulsion or suspension of an individual member likewise govern revocation or suspension of a local's charter. Although many of the decisions addressed themselves primarily to procedural aspects of fair hearing, there is no indication against a carry-over to include the more substantive of Professor Cox's five requirements.[20]

While these standards for judicial intervention were developed under state common law, it was appropriate for the District Court to accept Professor Cox's formulation as a guide for decision in these cases arising under federal law. The Supreme Court has told us that in fashioning federal law in suits brought under section 301 upon collective bargaining agreements, "state law, if compatible with the purpose of § 301, may be

19. "Upon the theory that improper expulsion violates the member's interest in the organization's property or a contract between him and other members made up of the constitution and by-laws or, in recent years, upon the ground that there is a tortious interference with an advantageous relationship, the state will set an expulsion aside upon any of five grounds:

"(1) The procedure violated the union's constitution or by-laws.

"(2) The constitution or by-laws did not authorize expulsion for the alleged offense.

"(3) The procedure, although it conformed to the union's constitution and by-laws, did not afford the member a fair hearing.

"(4) The expulsion, although it was authorized by the union's constitution and by-laws, was unreasonable, contrary to 'public policy,' or contrary to 'natural justice.'

"(5) The expulsion was in bad faith because the purported ground was only a pretense for getting rid of a troublesome member."

Cox, "Internal Affairs of Labor Unions Under the Labor Reform Act of 1959," 58 Mich.L.Rev. 819, 835–836 (1960). Accord, Cox, "The Role of Law in Preserving Union Democracy," 72 Harv. L.Rev. 609, 615 (1959); see Sherman, "The Individual Member and the Union: The Bill of Rights Title in the Labor-Management Reporting and Disclosure Act of 1959," 54 Nw.L.Rev. 803, 820–821 (1960); Summers, "American Legislation for Union Democracy," 25 Modern L.Rev. 273, 279–283 (1962); see generally, Summers, "The Law of Union Discipline: What the Courts Do in Fact,"

70 Yale L.J. 175 (1960); Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049 (1951); Annotation, 21 A.L.R.2d 1397 (1952).

20. See Ellis v. AFL, 48 Cal.App.2d 440, 120 P.2d 79 (1941); Hatch v. Grand Lodge Brotherhood of Railroad Trainmen, 233 Ill.App. 495 (1924); Gardner v. Newbert, 74 Ind.App. 183, 128 N.E. 704 (1920); Mixed Local of Hotel and Restaurant Employees Union Local No. 458 v. Hotel & Restaurant Employees International, 212 Minn. 587, 593, 4 N.W. 2d 771, 775 (1942); Naylor v. Harkins, 11 N.J. 435, 94 A.2d 825 (1953) (affirming issuance of a preliminary injunction), 32 N.J.Super. 559, 571, 109 A.2d 19, 26 (App.Div.1954), ordering a permanent injunction and reversing, 27 N.J. Super. 594, 99 A.2d 849 (Chancery Div. 1953); Mayer v. Hutcheson, 18 N.Y.S.2d 691 (Sup.Ct.), reversed on other grounds, 260 App.Div. 150, 20 N.Y.S.2d 698 (1940), aff'd 285 N.Y. 832, 35 N.E.2d 501 (1941); Moore v. Moreschi, 179 Misc. 475, 39 N.Y.S.2d 208, aff'd without opinion, 265 App.Div. 989, 40 N.Y.S.2d 334, aff'd with modifications as to scope of injunction, 291 N.Y. 81, 50 N.E.2d 552, modified according to mandate, 182 Misc. 264, 44 N.Y.S.2d 402 (1943); Schrank v. Brown, 192 Misc. 80, 80 N.Y.S.2d 452 (1948); 192 Misc. 603, 81 N.Y.S.2d 687 (1948); 194 Misc. 138, 86 N.Y.S.2d 209 (1949); International Union of Operating Engineers v. Pierce, 321 S.W.2d 914, 918, 919 (Tex.Civ.App.1959); Washington Local Lodge No. 104, etc. v. International Brotherhood of Boilermakers, 33 Wash.2d 1, 68–71, 203 P.2d 1019, 1058–1059 (1949); see also, Annotation, 21 A.L.R.2d 1397, 1403 (1952); 87 C.J.S. Trade Unions § 45.

resorted to in order to find the rule that will best effectuate the federal policy." Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). It has not been suggested in this case that the same may not be done in suits based on "contracts * * * between * * * labor organizations." In addition, it is appropriate for federal courts, relatively inexperienced in handling internal union cases, to look to existing state law concepts in applying the new provisions of the LMRDA.[21]

### The District Court's Opinion

■ In deciding the merits the District Court specifically held that Local 28 called the June strike in violation of Art. XVII, § 13 of the IBEW Constitution, which required the IP's authorization, and that the Local failed to take the opportunity available under Art. IV, § 3(2) and Art. XVII, § 13 of the IBEW Constitution, to appeal to the IEC from the IP's determination that this was a strike requiring his consent. In addition, it held that when the IP later revoked Local 28's charter, as he was empowered to do, see Art. IV, § 3(8) of the IBEW Constitution, he was motivated in part by a legitimate desire to punish the Local and its members for conducting an unauthorized and forbidden strike.

The court nevertheless concluded that the IP's action breached his and the International's fiduciary obligation to Local 28 under the International Constitution, and thereby also violated rights of the Local's members which are protected by the LMRDA.

First, the District Court held that the revocation hearing was not fair because the IP was not an impartial and unbiased judge. Although the IEC was found to be unbiased, the court concluded that the

review by that body did not cure the defects in the initial proceeding for the review was appellate only and not a trial de novo. Second, the court held that the IP's action had been partially motivated by "improper reasons," in breach of his and the International's fiduciary obligation owing under the International Constitution. Finally, the court concluded that the sanction imposed was unreasonable and unjust under all the circumstances in that the rank and file members had been innocently caught in the middle of a dispute between the leaderships of the Local and International.

### Obligations Of and To IBEW

While clearly correct in its recognition of the theoretical basis for judicial intervention, we think that the court erred in applying these principles to the facts it had found. Although there is no hint of corruption and the court specifically declared that there was no sufficient evidence that the IP was moved by "express or particular malice, i. e. ill-will, spite, a grudge, or a desire to be revenged on a particular person or persons, resulting in a deliberate intention to commit an injury," it nevertheless held that the IP "did act wilfully and intentionally, for the purpose, inter alia, of imposing severe discipline on the members of Local 28, and without due regard for the duty he owed to them, as well as to the IBEW as a whole. In that sense his action amounted to legal malice." 203 F.Supp. at 309.

The primary basis for the holding of "legal malice" was that the IP had acted from "mixed motives" to impose the discipline.

What are these "mixed motives"? The court found that although the IP had acted "to maintain necessary union discipline" (Id. at 308) and was untainted by express or particular malice, ill-will,

21. Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J. 175, 176–177 (1960); see Detroy v. American Guild of Variety Artists, 286 F.2d 75, 78–79 (2d Cir.), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); cf., Highway Truck Drivers and Helpers Local 107 v. Cohen, 182 F.Supp. 608, 617 (E.D.Pa.), aff'd per curiam on other grounds, 284 F. 2d 162 (3d Cir., 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961).

etc., he had improperly moved "to rid himself of troublesome leadership in the Baltimore area, and to discipline the members of Local 28 for their refusal to agree to submit their disputes to the Council and for having brought several suits against him and the IBEW." Id. at 308. The wrongful ingredient in the "mixed motives" cannot be that the IP acted to rid himself of troublesome leadership or to discipline members; he is clearly empowered to do both of these things—especially in response to an unauthorized strike, as the court itself recognized. The imputed impropriety rests on the court's finding that the IP was moved not only by the unauthorized strike but also by the fact that the plaintiffs had earlier brought suits challenging the International and refused to submit disputes to the Council. It is plain that the court's decision is almost wholly based upon a belief that because of the manner in which the International resisted the Local's will in collective bargaining, it breached its fiduciary obligation to the Local and its members. This needs to be examined.

Before discussing the propriety of the intervention by the International in the Local's collective bargaining, it is appropriate to note that the District Court found that the IP had been motivated in part by a legitimate desire to discipline the Local, its members and officers, for having engaged in an unauthorized strike even after his repeated orders to return to work.

The calling of a strike is such a momentous step in a labor controversy that it is usually subjected to strict control by international unions.[22] The strike is a weapon that can bring an employer to his knees; but the effect on the employer can be too devastating for the union's own good. In addition, a strike can result in undue loss of production, harmful to the public, and a strike can waste a union's funds and otherwise weaken it in its continuing effort to better its adherents' wages and working conditions.

It is widely felt that vesting control in the international over the strike weapon assures that generally only intelligent and responsible use will be made of it after the greater interests of the international and the general economy have been considered. Such is the potential harm from indiscriminate resort to strikes that Professor Summers has commented that an international is justified in adopting severe disciplinary measures, including expulsion of individual members or revocation of a local union's charter, when an unauthorized strike has been undertaken. Summers, "Legal Limitations on Union Discipline," 64 Harv.L. Rev. 1049, 1065–1066 (1951).

The refusal to sanction the June strike cannot be said to be a breach of a fiduciary duty owed the plaintiffs under the Constitution. If the IP believed that an appropriate Council clause could be negotiated and that Local 28 was excessive in its demands and "shooting for the moon," it was his prerogative to restrain the Local, and if possible to counteract its headstrong determination to wage a strike that could adversely affect the cause of his international organization.[23]

---

22. Barbash, Labor's Grass Roots (1961) pp. 150–151; Leiserson, American Trade Union Democracy (1959) p. 321; Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1462 (1962).

23. The District Judge found that in refusing consent to the strike "the IP was * * * primarily moved by a desire to acquire and retain as much control as he could over the negotiations with the Maryland Chapter, because he distrusted Eveson, Beckhardt and O'Doherty and other leaders of the group that controlled

Local 28, as the result of previous difficulties * * *." 203 F.Supp. at 302.
Under the International Constitution it cannot be said that the IP could not legitimately desire to intervene in the negotiations. In addition, the District Judge specifically held that this was a strike requiring the IP's consent and that the IP's refusal was not appealed to the IEC, 203 F.Supp. at 306, in which case the plaintiffs have waived judicial review of this action of the IP. Thus, while the refusal to sanction the strike must be taken as valid and cannot be impeached directly, the result of the

His duty was to 750,000 members, not merely to a few who might gain a short-range advantage that could prove costly to the parent body, the employers, the public and, in the long run, to the plaintiffs themselves.[24] The International was dealing day by day with many chapters of NECA and the International's relations with NECA were important to the welfare of all 150,000 who worked in the construction industry.

Severe measures were taken against the Local, but only after full opportunity had been given the strikers, first to comply with the IP's back-to-work order and later, in the revocation decision itself, to redeem themselves. That this may be the first instance in which this International revoked a local's charter for going out on an unauthorized strike is not particularly relevant, since there is apparently no precedent for the obdurate persistence of this Local after ample warnings.

[4] Although this court recognizes that in determining the validity of disciplinary proceedings there is an obligation to draw upon standards of fairness beyond those expressed or embraced in the union constitution, much more is in question here than the mere propriety of an act of discipline. Even as formulated by the District Judge, the issues involve considerations of basic union policy and structure, i. e., how shall the power over collective bargaining be distributed within the labor organization?

What has been granted the parent body as its proper province in collective bargaining and what has been retained by the local—perhaps it is more accurate to put it the other way: what

has been retained by the parent and what has been granted to the subordinate—is a matter of internal government resting upon the contract the local and its members have made in accepting a charter from the parent. This court is advertent to the prevailing policy favoring internal union democracy [25] and, of course, it recognizes that in appropriate cases courts may intervene to redress grievances arising from the imposition of discipline upon locals or individual members; but, in the absence of specific legislation, it does not lie within the authority of a court to give effect to its general preferences between international power and local autonomy in matters of collective bargaining. Questions as to how relations between an international and its local might best be regulated are for internal settlement or for Congress, which possesses the legislative power. Judges lack that power even when they are convinced of the desirability of improvements in the law.

It is noteworthy that in the initial drafts of the bills that became the Taft-Hartley Act (LMRA), provisions were included in both Houses that would have either prohibited industry-wide bargaining or explicitly guaranteed to local unions the right to conduct their own collective bargaining entirely free from international interference. There was extensive debate on these proposals. A strong provision prohibiting industry-wide bargaining was passed in the House of Representatives. In the Senate Committee on Labor and Public Welfare restrictive provisions were eliminated from the Senate bill. When the bill reached the floor, attempts to reinstate such a provision by amendment were de-

court's decision is to impeach it indirectly. The revocation was the lawful means chosen by the IP to terminate the forbidden strike as well as to discipline the recalcitrants. In the circumstances it would seem to have been the only effective means to restore industrial peace.

24. The District Court in fact observed that a 35¢ increase "would have brought Local 28's scale about in line with neighboring cities, although it may have been

unrealistic in view of the strong non-union situation in Baltimore." 203 F.Supp. at 302 n. 24.

25. See the LMRDA, 29 U.S.C.A. § 401 et seq.; see also, e. g., Cox, "Internal Affairs of Labor Unions Under the Labor Reform Act of 1959," 58 Mich.L.Rev. 819, 829–831 (1960); Summers, "American Legislation for Union Democracy," 25 Modern L.Rev. 273, 273–279 (1962).

feated. In conference the House yielded to the Senate. Consequently no such restrictive provisions were enacted. See references under "Industry-wide Bargaining," in the Topical Index to the Legislative History of the LMRA at p. XXXVI.

Although state courts have traditionally exercised some supervisory function over local-international relations,[26] and the federal courts are now empowered to intervene in some areas under a number of provisions of the LMRDA, federal judges may not, on their own, cure whatever deficiencies they may think exist in the pattern the parties have fashioned.

In return for the strength the local gets from the international it accepts a measure of international control.[27] This is plainly spelled out in this Union's Constitution, and as a rule such a structural arrangement has been thought necessary in the labor movement. As Professor Barbash has written, "When a local union makes a collective bargaining decision which seriously prejudices larger interests in the union, these latter are to all intents and purposes being excluded from a voice in a decision on which (democratically) they have a right to be heard." [28]

The broad mandate of power to the IP made by the Union Constitution is designed to be used by him to promote such methods of collective bargaining as seem conducive to the interests of the entire organization. If the policy of the IBEW is to favor the Council device, or if in the IP's discretion it seems suitable in a particular instance, or if in his judgment an impending strike is not an appropriate bargaining weapon, there is nothing in the law that forbids his insisting that the local accede to his judgment. When the IBEW's Constitution and its experience over the years are brought into focus, such insistence by the IP in this case could well have been thought by him the only feasible method of accomplishing a peaceful and proper solution of the dispute between Local 28 and the Maryland Chapter.

We have seen in the statement of facts how completely committed the IBEW has been over a span of decades to the policy of requiring its locals to bargain collectively before the CIR, the chosen instrument for the resolution of disagreements which could not be settled at the local level. And it is undisputed that this policy has served the parties well over the years.[29] The IP, as a witness in

26. See, e. g., Cohn, "The International and the Local Union," 11 N.Y.U.Ann.Conf. Labor 7 (1958); Summers, "Union Schism in Perspective: Flexible Doctrines, Double Standards and Projected Answers," 45 Va.L.Rev. 261 (1959).

27. The District Court correctly recognized that:
"The evidence in the instant cases, however, makes it clear that those [worthy] results [of the Council's service] have been achieved through a tight control over the agreements of most local unions by the international officers of the IBEW, particularly the IP, at the cost of a large measure of the autonomy of the local unions. The IBEW constitution gives at least lip service to the principle that the local unions shall do the collective bargaining for their members but it also contains provisions which appear to authorize the control over the affairs of the local unions exercised by the IP.

"The provisions which shall be included in the constitution and the policies which shall be followed by the officers are matters for the union as a whole to decide, subject to the restraints imposed by law. Federal courts may impose such restraints only within the jurisdictional limits provided by Congressional enactments, and must follow the policies established by the statutes, as interpreted by authoritative decisions." 203 F.Supp. at 310.

28. Barbash, "Power and the Pattern of Union Government," 9 Lab.L.J. 628, 633 (1958); see also, Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1462 (1962); cf., Spitz, Democracy and the Challenge of Power (1958) pp. 82–84.

29. During the trial in Local 28's action to determine the terminability of the 1958 agreement the court declared:
"I am not saying that the arbitration clause is not a very good thing. It ob-

court, made no concealment of the fact that he favors Council clauses in all agreements and that he has on occasion pressed reluctant locals to accept them, even to the extent of threatening to transfer one local's jurisdiction to another.

Additionally, the conferences between IBEW, NECA and Maryland Chapter officials, relative to the Council and other matters of mutual concern, e. g., the meetings in which it was decided not to appeal from the District Court's order ruling the 1958 agreement terminable, cannot in fairness be cast in the sinister terms of a breach of fiduciary obligation to the Local. Even as it spoke of the International's duty to the Local the court itself recognized that "the officers of the International and of NECA have a common interest in the Council as a means of stabilizing labor relations in the industry,

which renders a large measure of cooperation between the two national organizations reasonable and desirable." 203 F. Supp. at 300 n. 22.[30]

While there is talk by the plaintiffs of local autonomy, it is plain that under the International Constitution the local can neither make nor abrogate a collective bargaining agreement without the IP's sanction. (Art. XVII, §§ 7–9, 11). That official is authorized to intervene in local negotiations at any stage and may negotiate agreements covering the entire industry, thereby pre-empting the local's autonomy. (Art. XVII, § 13; Art. IV, § 3(12)). The policy underlying this Union's Constitution and its practice has been to permit the International's intervention, if that is deemed necessary to prevent an interruption in the work when a breakdown has occurred in the local negotiations. The durability of the

---

viously has been a splendid thing for the industry. It has prevented strikes and the whole system is a good system.

\* \* \* \* \*

"I do not make any criticism of the Council, \* \* \* it is perfectly obvious over the years it has done a fine job \* \* \*."

In its opinion the court said:

"Certainly, it is highly desirable that the local unions of the IBEW and the chapters of NECA take advantage of the services of the Council; the evidence shows that it has served all parties well over the years." 194 F.Supp. at 501–502.

In the opinion under review the District Judge concluded that the wage increases granted by the Council to the Local in 1958, 1959, and 1960 were:

" \* \* \* not unfair or unreasonable under all the circumstances, including the wage rates of comparable building trades in Baltimore, where unions are not as strong as in Philadelphia, Wilmington and Washington." 203 F.Supp. at 299.

And most specifically the court stated:

"I adhere to the view that the Council has served the parties well over the years. Wages have steadily increased, in line with other comparable building trades, and there have been remarkably few strikes." 203 F.Supp. at 310.

**30.** Findings that IBEW, NECA and Maryland Chapter officials cooperated in the

founding of Local 24 by dissident members of Local 28, including supervisory personnel of two employers who had resigned their supervisory positions to take a more active part in union activities, were also a part of the *res gestae* that led the court to hold that the IP acted with "legal or constructive malice." We are of the opinion that, in this industry where there is admittedly close rapport between employers and the union relatively free mobility between the employer and employee categories, the activities shown to have occurred during the formation of the new Local cannot be said to have breached a fiduciary obligation owed by the International to the existing Local and its members.

While not a breach of fiduciary obligation under the facts in this case, to the extent that there may be employer domination of the new Local, as comprehended under § 8(a) (2) of the LMRA, 29 U.S.C.A. § 158(a) (2), the matter is for the Labor Board to rectify.

To the extent that members of Local 28 who hereafter join Local 24 may be denied equal rights within Local 24, in violation of § 101(a) (1) of the LMRDA, 29 U.S.C.A. § 411(a) (1), the plaintiffs are complaining of matters that may more properly be raised in new proceedings where concrete facts of alleged specific denials of equal right to particular individuals may be adduced. Cf., e. g., Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

Council evidences that participation of the International is the accepted format of collective bargaining in this industry.[31]

■ Here it was not misconduct or a violation of fiduciary obligation for the IP to press for the reference of all unresolved bargaining issues between the Local and the Maryland Chapter to the Council for final solution. This is all that the District Court found the IP had told Geary, NECA chief executive, that he would do. The IP's decision denying permission to strike and his revocation order were consistent with this.

■ One of the unresolved issues between the Local and the Chapter was whether a Council clause should be included in the collective bargaining agreement and, if so, what its scope should be. Even if it is assumed that at the time of the strike the IP was irrevocably committed to the imposition on the Local of a "yellow sheet" "evergreen" clause,[32] such a clause would do no more than keep the parties negotiating during a dispute instead of engaging in industrial warfare. As Professor John T. Dunlop, Chairman of the Department of Economics at Harvard University, a man vastly experienced in labor negotiation procedures, testified at the trial:

"The facts of life are that the parties really don't have much opportunity for divorce * * * and they are going to have to work out an agreement before a strike, or after a strike * * *." [33]

This being the reality of industrial life, it cannot be said by a court that as a matter of law the IP overstepped his authority or ignored or breached his obligation to the Local by pressing for such a Council clause.

■ Without actually deciding the question, the District Judge made known his belief that an "evergreen" clause, making the issue of termination justiciable before the Council, would be illegal. He chose, however, to rest his decision on the ground that, aside from the questions that were debated concerning the "yellow sheet" clause, the IP's conduct was an attempt to usurp the Local's role in collective bargaining. This court is of the opinion that even assuming that an "evergreen" clause would be unilaterally terminable under § 8(d) of the LMRA, 29 U.S.C.A. § 158(d),[34] it was still within the right of

---

31. Although the general literature bearing directly on international union intervention in local negotiations is sparse, there are indications of a tendency toward increased international control in collective bargaining. See Barbash, Labor's Grass Roots (1961) 149–150; Leiserson, American Trade Union Democracy (1959) 287–288; Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1462–1463 (1962) ; see also, Pierson, "Multi-Employer Bargaining," in Bakke, Kerr and Anrod, Unions, Management and the Public (1960) 343–349; Slichter, Healy and Livernash, The Impact of Collective Bargaining on Management (1960) 927–930.

32. The evidence on this point was conflicting. Although the District Judge intimated that the IP was so committed, he made no specific finding to this effect. See 203 F.Supp. at 298, 302 n. 27, 304.

33. See also, Chamberlain, "Collective Bargaining and the Concept of Contracts," 48 Colum.L.Rev. 829 (1948) ; Kotin, "Labor Agreements in Collective Bargain-ing," 6 N.Y.U.Ann.Conf.Lab. 1, 5–6 (1953) ; Summers, "Judicial Review of Labor Arbitration or Alice Through the Looking Glass," 2 Buffalo L.Rev. 1, 14–15 (1952) ; Goldberg, "Labor Arbitration— A Symposium: Introduction," 37 N.Y.U. L.Rev. 359–361 (1962).

34. See Boeing Airplane Co. v. NLRB, 85 U.S.App.D.C. 116, 174 F.2d 988, 991 (1949) ; Boeing Airplane Co. v. Aeronautical Industrial Dist. Lodge 751, IAM, 91 F.Supp. 596, 603 (W.D.Wash.1950), aff'd per curiam, 188 F.2d 356 (9th Cir.), cert. denied, 342 U.S. 821, 72 S.Ct. 39, 96 L.Ed. 621 (1951) ; cf., Boston Printing Pressmen's Union v. Potter Press, 141 F. Supp. 553 (D.Mass.1956), aff'd. 241 F.2d 787 (1st Cir.), cert. denied, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34 (1957) ; Couch v. Prescolite Mfg. Corp., 191 F.Supp. 737 (W.D.Ark.1961) ; In re Valencia Baxt Express, Inc., 199 F.Supp. 103 (D.P.R. 1961) ; but cf., Division 892 Amalgamated Ass'n of Street, Electric Ry. and Motor Coach Employees of America v. M. K. & O. Transit Lines, 210 F.Supp. 351

the IP to insist, as a matter of policy within the union organization, that such a clause be accepted. Even if we assume the correctness of the District Court's obitur dictum that the "yellow sheet" clause was illegal, in the sense that it was unenforceable, it was certainly not so evil or contra bona mores as to vitiate the IP's constitutional powers to control collective bargaining.

 It has been argued, however, that the "evergreen" clause is defective, perhaps illegal, as a divestiture of the statutorily protected power of the union to strike. "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties," the Supreme Court has said, "is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." NLRB v. Insurance Agents' International Union, 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960). But it is not the purpose of the law to impose a straight jacket on the format of collective bargaining or to *require* that the parties always maintain economic force as an alternative. The Court has in fact recognized that economic weapons may be relinquished, at least for a time, and particularly in exchange for an agreement to settle disputes by arbitration, see Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed. 2d 972 (1957); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 104–106, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962),[35] which is the touchstone of the practice of peaceful industrial self-government. See United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 577–582, 80 S.Ct. 1347, 5 L.Ed.2d 1409 (1960). Submission to the Council is not classical arbitration, but resembles it sufficiently to fall within the ambit of this policy.

 Even if a union cannot be compelled to relinquish economic weapons perpetually, there is nothing in the law to suggest that it may not voluntarily forebear from the use of force as long as it chooses to do so. At most, the International can be said to have attempted to compel one of its component bodies to do this. It is not for the courts to say that a superior union body cannot require its subordinate to look to high level bargaining rather than to the use of economic force.

 Actually, adoption of the more stringent Council clause would not surrender the strike weapon irretrievably; it would merely fortify the provision in the Constitution vesting control over this weapon in the International. It would remain within the power of the International to restore the strike weapon to a local. The District Court found that "[t]he IP had given his consent to a number of strikes where a Council clause appeared in the contract * * *." 203 F.Supp. at 302 n. 26. Apparently this was done without disturbing the Council machinery. Moreover, the International could work within the Council for the termination of an "evergreen" agreement. The point is that while the IP can be said to have attempted to compel the Local to forebear from resorting to the strike, the IBEW itself did not surrender the strike instrument. It is not for the court to say that the International could not put this restraint on its Local.

 It should be emphasized that we are not called upon to determine whether and under what circumstances a perpetual agreement between a labor organization and an employer may or may not be enforceable. What is before us is an internal union agreement vesting extensive powers in an international body—including the power to veto the use of the strike

(N.D.Okla.1962). (Holding, although a contract had been terminated arbitration could still be demanded in respect to the terms of the new contract).

35. There the Court stated that "the basic policy of national labor legislation [is] to promote the arbitral process as a substitute for economic warfare." Id. at 105, 82 S.Ct. at 578.

weapon by its local unions. If this International insists that its locals shall complete the collective bargaining process before the Council, composed equally of representatives of the International Union and of the Employer Association, such insistence is certainly not illegal. Nor does it become illegal if the International seeks to enhance the stability of this system by requiring that not only proposed alterations in the collective bargaining agreement but its termination as well shall be a justiciable issue before the Council. The impact of the court's decision in this case is to impose a method of collective bargaining different from that contemplated in the Union Constitution, long and satisfactorily used by employer and employees. This it cannot do.

### Earlier Suits

The final purportedly improper ingredient in the "mixed motives" was that, as the court found, the IP was partly influenced to revoke Local 28's charter because suits had been brought challenging the authority of the IBEW, without first exhausting available internal remedies. As the basis for this finding the court cites the fact that the IP had "stated publicly that he 'hated' the Landrum-Griffin Act because it protected access to the courts by union members." 203 F.Supp. at 302, 304. This finding would appear to relate to an address made by the IP before the 60th Convention of NECA in October, 1961—two months after the revocation order.

There were in fact three suits filed prior to 1961—on December 11, 1959, March 22, 1960, and apparently in April, 1960. The last two were dismissed on November 9 and December 20, 1960, and the District Court found that "[f]rom August 1960 until March 1961 the relations between Local 28 and the International officers were apparently friendly." 203 F.Supp. at 299. The unauthorized strike did not occur until the middle of June, 1961, and the Local's charter was revoked by an order dated August 1, 1961.

Accepting this finding of some relation between the earlier suits and the IP's actions, we think it may not be given controlling significance over the array of valid and legitimate motives shown and the court's unequivocal finding absolving the IP from "express or particular malice, i. e. ill-will, spite, a grudge, or a desire to be revenged on a particular person or persons, resulting in a deliberate intention to commit an injury." 203 F. Supp. at 309.[36] It would be a distortion of the record to elevate this factor to a position of pre-eminence, blotting out the permissible reasons for revocation of the charter.[37]

This court recognizes that should it be demonstrated in an appropriate case that the *basic* reason for union discipline was that the plaintiff had resorted to a court of law to secure his rights and that other reasons were mere shams, such discipline would most likely be invalid both as a breach of fiduciary obligation and because it is prohibited under §§ 609 and 101(a) (4) of the LMRDA, 29 U.S.C.A. §§ 529 and 411(a) (4).[38] But such a case would be different from the present one. That the reasons given by the IP for the revocation here are not shams is amply established by the District Court's reservation of the International's right to retry the leaders of Local 28.

### Fair Hearing

The common law clearly requires that, to be valid, expulsion of a member

---

36. This opinion has already demonstrated that other assailed elements of the "mixed motives," found by the District Court, were neither in fact nor law improper.

37. Compare the instant case with, e. g., Nelson v. Brotherhood of Painters, Local 386, 47 L.R.R.M. 2441, 41 L.C. par. 16,-755 (D.Minn.1961) ; Moore v. Moreschi, 179 Misc. 475, 39 N.Y.S.2d 208, aff'd without opinion, 265 App.Div. 989, 40 N.Y.S.2d 334, aff'd with minor modifications, 291 N.Y. 81, 50 N.E.2d 552, modified according to mandate, 182 Misc. 264, 44 N.Y.S.2d 402 (1943).

38. See Sheridan v. United Bhd. of Carpenters, 191 F.Supp. 347, 351–352; 194 F.Supp. 664 (D.Del.1961), rev'd on other grounds, 306 F.2d 152 (3d Cir.1962).

or a subordinate body must be rendered after a "fair hearing." See, e. g., Cox, "Internal Affairs of Unions Under the Labor Reform Act of 1959," 58 Mich.L. Rev. 819, 835–836 (1960).[39] The elements of such a "fair hearing" often resemble constitutional due process requirements and generally encompass full notice and a reasonable opportunity to be heard—including the right to present evidence and the right to confront and cross-examine witnesses.[40] There is also a body of law requiring trial of an accused before an unbiased tribunal.[41] Some commentators seem to think that the courts should play a more active role in reviewing not only specific bias, e. g., pre-judgment or use of discipline pretextuously, but also built-in bias, e. g., combined prosecuting and judicial functions and use of "yes men." They have, however, generally recognized either that the courts have not been empowered to do this or that they are unable to reach such bias for it "is an inevitable product of the procedure itself." [42]

██ The District Court, without passing on the question of whether the IP had the authority to decide this case, held "it was one which he should have referred to the IEC or some other impartial tribunal * * *, [as] the propriety of his own action and his own good faith and motives in refusing consent to the strike and in preparing, filing and pressing the charges were being called into question."

203 F.Supp. at 307. This supposed defect was held not to have been cured by review by the IEC. Although the court found that the IEC was not prejudiced, it held that the review was in the nature of an appeal, not a trial de novo. We do not agree that, on the facts in this case as established in the court's findings, there was a procedural defect in the trial before the IP justifying a court of law to interfere with and to overturn the action taken.

In the first place, the IP was clearly empowered, by the International Constitution, to decide the issues involved in the revocation proceedings and to revoke the Local's charter. The IP is empowered, as we have seen, "[t]o decide all questions of law, disputes or questions in controversy however arising, all his decisions being subject to appeal, first to the I.E.C. and then the I.C. * * *." He is also specifically authorized "[e]ither to suspend or revoke the charter of any L.U., or have the I.S. reject the per capita tax from any L.U. that fails or refuses to observe the laws and rules of the I.B.E.W." (Art. IV, § 3(2), (8)). And it is provided, in addition, that nothing in the Constitution shall be construed to conflict with any provision of Article IV, enumerating the powers of the IP. (Art. IV, § 5).

The real basis for the argument that the IP was biased is that he was, in a sense, both prosecutor and judge. It is

39. We reject the suggestion of the defendant that since under the Constitution the Local agrees that its charter may be revoked without a hearing, the hearing given by the IP may be beyond challenge. At common law, and now under the LMRDA, the requirement of a fair hearing exists regardless of whether the Union Constitution provides that sanctions may be imposed without any hearing. See, Annotation, 21 A.L.R.2d 1397, 1410–1413 (1952) ; § 101(a) (5) of the LMRDA, 29 U.S.C.A. § 411(a) (5).

40. See, e. g., Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J. 175, 200–206 (1960) ; Cox, "The Role of Law in Preserving Union Democracy," 72 Harv.L.Rev. 609, 616 (1959).

41. See, Ibid.; Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J. 175, 204–205 (1960) ; Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049, 1082–1083 (1951) ; Annotation, 21 A.L.R.2d 1397, 1425–1428 (1952).

42. Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049, 1083 (1951) ; see Summers, "American Legislation for Union Democracy," 25 Modern L.Rev. 273, 288–289 (1962) ; Aaron, "The Labor-Management Reporting and Disclosure Act of 1959," 73 Harv.L.Rev. 851, 873–875 (1960) ; Wollett & Lampman, "The Law of Union Factionalism—The Case of the Sailors," 4 Stan.L.Rev. 177, 213 (1952) : Note, 48 Va.L.Rev. 78, 90 (1962).

quite true that he ordered the charges to be brought and conferred with the International's General Counsel in their formulation as well as in the preparation of the revocation order. But it is also true that the basis for the charges was that the Local had struck in defiance of his repeated admonitions and had rejected his collective bargaining orders. And there can be no doubt that the Constitution vested in the IP these combined prosecuting and judicial functions.[42a]

Although the charge was defiance of the orders that the IP had issued, his actions in issuing the orders and in their vindication were official not personal. If we are to give effect to the District Court's finding exonerating the IP of "express or particular malice, i. e ill-will," etc. (see 203 F.Supp. 309), it cannot be said that in ordering charges to be brought he was acting to vindicate a personal affront rather than the interest of the Union.

It may well be thought desirable for unions to adopt hearing procedures that keep trial functions separate, but the federal courts are not empowered so to restructure the disciplinary procedures of unions. Cf., Summers, "Legal Limitations on Union Discipline," 64 Harv.L. Rev. 1049, 1083 (1951) (implied). Some unions, like the United Automobile Workers, have responded to the pressure for fairness in internal trial proceedings by establishing, essentially external to the union organization, independent public review boards having the final word in disciplinary matters.[43] Such unions would appear to have gone far to separate prosecuting and ultimate judicial functions. But, in the absence of a clear congressional authorization, it is not for the federal courts to compel such measures.[44] This is, in effect, what the District Court's decision has done.

Separation of functions is not an absolute due process prerequisite to fairness in administrative proceedings, see 2 Davis, Administrative Law Treatise § 13.02; in internal union proceedings it traditionally, and under the LMRDA, has also not been deemed a requirement of fairness.[45] Courts, federal courts especially, are justified in ruling a union tribunal biased only upon a demonstration that it has been substantially actuated by improper motives—in other words, only upon a showing of specific prejudice. This element has been found absent from the present case.

### Severity of the Sanction

The District Court showed a commendable concern to protect those members of Local 28 who refused to join Local 24 against hardship resulting from the charter revocation—a concern which carried over in favor of the Local itself, though not its leaders. However attractive the court's solution may appear, we find no basis or authority for the court to compel this distinction to be made between leaders and rank and file. Moreover, in the circumstances of this case there would seem to be no justification

42a. It should be noted, however, that the initial factual inquiry was made, not by the IP, but by a referee found by the District Judge to be "fair and impartial." 203 F.Supp. at 307.

43. See Brooks, "Impartial Public Review of Internal Union Disputes: Experiment in Democratic Self-Discipline," 22 Ohio St.L.Rev. 64 (1961); Oberer, "Voluntary Impartial Review of Labor: Some Reflections," 58 Mich.L.Rev. 55 (1959); Aaron, "The Labor-Management Reporting and Disclosure Act of 1959," 73 Harv. L.Rev. 851, 874 (1960).

44. Professor Summers reports that Senator McClellan's proposal to require that impartial arbitrators determine disciplinary matters was deleted from the final draft of the LMRDA. Summers, "American Legislation for Union Democracy," 25 Modern L.Rev. 273, 289 (1962). Compare § 101(a) (6) (E) of the McClellan Amendment, 105 Daily Cong.Rec. 5810 (April 22, 1959), Legis.Hist. of the LMRDA, Vol. II, p. 1102, with § 101(a) (5) of the LMRDA, 29 U.S.C.A. § 411 (a) (5).

45. See, e. g., Summers, "American Legislation for Union Democracy," 25 Modern L.Rev. 273, 288–289 (1962); Aaron, "The Labor-Management Reporting and Disclosure Act of 1959," 73 Harv.L.Rev. 851, 874 (1960).

for permitting a retrial of the officers and leaders, but before another tribunal, and setting aside the action against the Local and proscribing any retrial of it or further proceedings based upon this offense.

The general membership cannot on this record be cast in the role of blameless victims. If they were for a time misled by their local leaders as to the IP's refusal to authorize or approve the strike, it is undisputed that when they later learned the truth they supported these leaders willingly enough in flouting the International. This they did in disregard of the District Judge's clear caution given May 11, 1961, in open court in the presence of several hundred members [46] and despite three personal letters from the IP sent to each member. Upon the facts found we cannot say that for their sake the sanction imposed upon the Local must be nullified. The immediate result might be an amelioration for these members; in the long view such a judicial directive, even if permissible, could break down their most effective organizational agency. At all events, a court is not empowered to grant the dispensation in this case.

## III. JURISDICTIONAL QUESTIONS

In addition to the defenses on the merits, the defendant interposes a series of defenses on jurisdictional grounds. We have deemed it better to defer the discussion of these questions till now, when the reader has been made familiar with the factual background.

### Labor Management Relations Act § 301(a)

◼ As the basis for district court jurisdiction, Local 28 relies upon § 301 (a) of the LMRA, 29 U.S.C.A. § 185(a), which provides:

"*Suits for violation of contracts* between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, *or between any such labor organizations,* may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." (Emphasis added.)

Concluding that the Local's suit was based upon violations of a "contract" (the International Constitution) between "labor organizations" (Local 28 and the IBEW) as both terms are used in section 301(a), the District Court held it had jurisdiction under that provision. Although the issue is by no means free from doubt, we are inclined to agree.

The Supreme Court has only recently focused its attention on the "between any such labor organizations" clause. In Retail Clerks International Ass'n, Locals 128 and 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d

---

46. "(The Court) Have you considered the fact that if you do go on strike or if you do refuse to go ahead with this policy which the International has set up and which all of the other local unions go along with and strike the International would very likely revoke your charter with whatever loss there is.

"It would seem to me that they have either got to end this whole agreement with these people or revoke your charter, one or the other.

"You are running an awfully close risk, and if you people understand that you are running that risk if you go on strike and if you terminate the agreement without going through with this plan, what has certainly up to this point been clearly demonstrated unless there is evidence to the contrary that this is the plan and policy of the International Union and that it has worked out to the satisfaction of the Union as a whole as well as to the employers as a whole over the years.

"And you people yourselves have taken advantage of the arbitration provisions within the last three years. So that it is a matter which has been gone ahead with.

"Now, at the present time I am very much inclined to think that you have a right to terminate, but once you terminate, I think you then can't expect to come to the Court and ask for protection against the International, if you terminate and strike.

"(Mr. O'Doherty) Yes.

"(The Court) Then you have great risks and you ought to do it with your eyes open. I am not saying what the legal effect is, but it may be severe."

503 (1962), it concluded that the word "contracts" as used in section 301(a) was not limited to collective bargaining agreements but was broad enough to comprehend strike settlement agreements. In reaching this result the Court reasoned that the term "contracts" had to be broader than collective bargaining agreements, otherwise the "between any such labor organizations" clause would have been surplusage—which it was not—for a collective bargaining agreement between a union as an employer and another union as representative of employees would be a contract "between an employer and a labor organization." 369 U.S. at 26–27, 82 S.Ct. at 547. So saying, the Court cited with favor United Textile Workers of America v. Textile Workers Union, 258 F.2d 743 (7th Cir., 1958), a case in which the Court of Appeals affirmed enforcement, under section 301(a), of an AFL–CIO sponsored no-raiding agreement between two international unions.

Although it is now clear that at least some "contracts," not collective bargaining agreements, between at least some types of "labor organizations" are enforceable under section 301(a), the Supreme Court has not yet addressed itself to the particular questions which concern us here, namely, (1) whether an international's constitution is a "contract" within the meaning of section 301(a) and (2) whether a local union and its international parent are "labor organizations" within the meaning of that section.

There is almost no congressional history pertaining to the "between any such labor organizations" clause. This clause was inserted in section 301(a) in conference only shortly before the bill's passage, and there is nothing to indicate what Congress specifically intended by its inclusion. Plausible arguments have been made that the clause should be interpreted as granting jurisdiction only over suits for violations of contracts that, like the AFL–CIO no-raiding agreements, have been freely negotiated between wholly autonomous or separate labor organizations.[47] This interpretation, opposing jurisdiction in suits like that of Local 28, is fundamentally grounded in the belief that Congress did not intend federal courts to become entangled in controversies within what is really a single union organization, and that it would be inappropriate for them to act in this area.[48]

Congressional history relating to provisions of the 1947 LMRA, other than section 301(a), tends to negative a congressional purpose to effect extensive and detailed statutory regulation of internal union affairs.[49] This history may only indicate that Congress did not mean at

47. See Meltzer, "The Supreme Court, Congress, and State Jurisdiction Over Labor Relations: II," 59 Colum.L.Rev. 269, 297 n. 287 (1959); Note, "Applying the 'Contracts Between Labor Organizations' Clause of Taft-Hartley Section 301: A Plea for Restraint," 69 Yale L.J. 299 (1959).

48. See Sun Shipbuilding & Dry-Dock Co. v. Industrial Union of Marine & Shipbuilding Workers, 95 F.Supp. 50 (E.D. Pa.1950); Local 33, International Hod Carriers Union v. Mason Tenders District Council, 186 F.Supp. 737 (S.D.N.Y.1960), aff'd on other grounds, 291 F.2d 496 (2d Cir., 1961); cf., Snoots v. Vejlupek, 87 F.Supp. 503 (N.D.Ohio 1949); Kriss v. White, 87 F.Supp. 734 (S.D.N.Y.1949).

Courts have also been concerned with possible conflicts between a broad interpretation of the "between any such labor organizations" clause and the Norris-La-Guardia and National Labor Relations Acts. See Local 33, International Hod Carriers Union v. Mason Tenders District Council, 186 F.Supp. 737 (S.D.N.Y. 1960), aff'd on other grounds, 291 F.2d 496, 505 (2d Cir., 1961) (Friendly, J. concurring specially); International Union of Doll Workers v. Metal Polishers International Union, 180 F.Supp. 280 (S.D.Cal.1960). See also, Note, 59 Colum. L.Rev. 202 (1959). The problems of accommodating the several labor statutes will be considered later.

49. Provisions regulating in detail certain aspects of internal union affairs, by declaring some acts to be unfair labor practices (thereby remediable by the Labor Board), were deleted in the House-Senate Conference. See House Rep. No. 510 on H.R. 3020, p. 46, in 1 Legis.Hist. LMRA at 550; 93 Cong.Rec. 6859 (June 12, 1947), 2 Legis.Hist. LMRA at 1623 (Sen-

the time to regulate by detailed substantive legislation enforceable by the Labor Board the relations between individual members and unions. Such a congressional purpose is not necessarily inconsistent with a vesting in the federal district courts of jurisdiction to enforce contractual obligations agreed upon by an international and its locals.

The most that can be said with certainty is that Congress did not anticipate the problem. Looking to expressions of congressional purpose in regard to other provisions of the Act, it is possible to infer that had Congress considered the problem it would have limited section 301(a) jurisdiction so that federal courts would not thereby be in a position to settle such internal disputes. It is also possible,

however, to conclude that Congress would have deemed it appropriate for federal courts to exercise jurisdiction over such disputes because, as the present one, they have traumatic industrial and economic repercussions. See § 1(b) of the LMRA, 29 U.S.C.A. § 141(b).[50] Moreover in interpreting the "between an employer and a labor organization" clause, the Supreme Court has consistently favored the broad view of section 301(a) jurisdiction.[51]

In the absence of a clear expression of congressional intention to the contrary, we consider it permissible to adopt the more literal interpretation of the "between any such labor organizations" clause—the interpretation that would support jurisdiction in this case.[52]

ator Taft, Supplementary Analysis of the Labor Bill as Passed, discussing § 8(b) (5)); Compare §§ 7 & 8, 29 U.S.C.A. §§ 157 & 158, with H.R. 3020, 80th Cong. 1st Sess., §§ 7(b) & 8(c), in 1 Legis.Hist. LMRA at 49–50, 52–56; see also, 93 Cong.Rec. 6443 (June 5, 1947), 2 Legis. Hist. LMRA at 1540 (Senator Taft on § 8(b) (5)); 93 Cong.Rec. 6503 (June 6, 1947), 2 Legis.Hist. LMRA at 1579 (Senator Murray, summary of differences between conference agreement and bill passed by Senate, discussing § 8(b) (5)).

In addition, to assure that § 8(b) (1) (A) of LMRA, 29 U.S.C.A. § 158(b) (1) (A), did not interfere with union membership policy, the proviso was added that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." See 93 Cong.Rec. 4271–4273 (April 30, 1947), 2 Legis.Hist. LMRA at 1139–1143 (debate on proviso); cf., e. g., 93 Cong. Rec. 4197 (April 29, 1947), 2 Legis.Hist. of LMRA at 1097 (Senator Taft discussing what is now § 8(a) (3)).

It should be noted that in 1959, with the passage of LMRDA, 29 U.S.C.A. § 401 et seq., Congress did undertake extensive and detailed statutory regulation of certain aspects of internal union affairs and organization.

50. It has been suggested that a holding of jurisdiction under § 301(a) would tend to promote at least two congressional policies. (1) A major purpose of § 301(a) is to overcome state law jurisdictional difficulties and thereby make unions amenable to suits as entities and to subject

their funds to judgments for violations of contracts. See Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 511–513, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). Section 301(a) jurisdiction in cases like Local 28's would make this responsibility more effective. (2) In 1959, with the passage of the Labor-Management Reporting and Disclosure Act, 29 U.S.C.A. § 401 et seq., Congress undertook extensive and detailed statutory regulation of certain aspects of internal union affairs. It is suggested that even assuming the LMRDA and § 301(a) may not be construed in pari materia, it would serve congressional policy to construe § 301(a) broadly, thereby making a whole remedy available in a federal court when the same conduct inflicts injury, adjudicable under LMRDA, upon individual members and also injury, not adjudicable under LMRDA, upon local unions.

51. See Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Retail Clerks International Ass'n Locals 128 and 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

52. See Local 33, International Hod Carriers Union v. Mason Tenders District Council, 291 F.2d 496 (2d Cir., 1961); Local 2608, Lumber Workers, United Brotherhood of Carpenters v. Millmen's Local 1495, United Brotherhood of Carpenters, 169 F.Supp. 765 (N.D.Cal.1958); see also, Burlesque Artists Ass'n v. Amer-

A local union is a "labor organization" within the definition of § 2(5) of the NLRA, 29 U.S.C.A. § 152(5).[53] In addition, "contract" as used in section 301(a) should be taken to include union constitutions. The Supreme Court itself has recognized that under state law this is the generally accepted characterization of union constitutions.[54]

As we think our discussion of the merits makes clear, this court fully recognizes its weighty obligation not to expand this initial grant of jurisdiction into a carte blanche for unrestrained judicial inventiveness in the areas of union structure and collective bargaining policy. The federal courts, in exercising jurisdiction under this clause of section 301 (a), are basically restricted to effectuating existing congressional policy. Cf., Textile Workers v. Lincoln Mills, 353 U.S. 448, 456–457, 77 S.Ct. 912, 1 L. Ed.2d 972 (1957). Our disagreement with the decision under review is not on the question of section 301(a) jurisdiction to entertain actions for alleged breaches of inter-union contracts; but we take the view that Congress has not adopted the substantive policies upon which the court's decision on the merits was predicated. It does not lie within a federal court's power or discretion to remake the contract by introducing even salutary provisions not legislatively prescribed or necessarily implied.

*Jurisdiction to Issue an Injunction in Suit of Local 28—Effect of the Norris-LaGuardia Act*

The defendant next argues that even if initially there is jurisdiction under § 301(a) of the LMRA over Local 28's suit, the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., denies the District Court jurisdiction to issue an injunction in this dispute.[55] The District

---

ican Guild of Variety Artists, 187 F. Supp. 393 (S.D.N.Y.1958); Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1485–1487 n. 150 (1962).

53. See NLRB v. Indiana & Mich. Elec. Co., 124 F.2d 50 (6th Cir., 1941), aff'd, 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579 (1943); cf., NLRB v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 (1951).

54. International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 618–619, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958); see also, Cleveland Orchestra Committee v. Cleveland Federation of Musicians, 303 F.2d 229, 230 (6th Cir., 1962); Rosen v. District Council No. 9, 198 F.Supp. 46, 47 (S.D.N.Y.1961).

55. The relevant provisions of the Norris-LaGuardia Act include: Section 1, 29 U. S.C.A. § 101:

"No court of the United States * * * shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provision of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

Section 4, 29 U.S.C.A. § 104:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute *to prohibit* any person or persons participating or interested in such dispute (as these terms are herein defined) *from doing,* whether singly or in concert, any of the following acts: [Emphasis added]

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization * * *;
 * * * * *
"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified * * *."

Section 7, 29 U.S.C.A. § 107, provides that an injunction will not lie in any case growing out of a "labor dispute" except after an adversary hearing where there is testimony in support of the allegations of the complaint to the effect—

"(a) That unlawful and illegal acts have been threatened and will be carried out unless enjoined;

"(b) That substantial and irreparable injury to the complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief

Court held that the case of the Local does not fall within the classes set forth in section 4, in which injunctions are absolutely prohibited, and that the case did not involve a "labor dispute" as used in section 7 and as defined in section 13(c). Acknowledging that the issue is debatable, we agree with the District Court's conclusion that, notwithstanding the Norris-LaGuardia Act, jurisdiction would exist in a proper case to issue a mandatory injunction.

Although the Supreme Court has not yet addressed itself to the problem of accommodating the "between any such labor organizations" clause of § 301(a) of the LMRA and the Norris-LaGuardia Act, it has said enough to provide useful guide lines for disposition of the issue as it arises in this case.[56]

In Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Court first recognized the broad scope of federal court jurisdiction that Congress had granted under § 301(a) of the LMRA. Holding that an arbitration clause in a collective bargaining agreement was enforceable under section 301(a), the Court also held that, notwithstanding the prohibitions and requirements of the Norris-LaGuardia Act, a mandatory injunction would lie to compel arbitration. The Court pointed out that historically arbitration was not one of the acts, listed in Norris-LaGuardia § 4, in respect of which the power to enjoin had been abused,[57] and that in fact Congress indicated, in section 8 of the Norris-LaGuardia Act, its policy of favoring labor

than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."

Section 8, 29 U.S.C.A. § 108, provides that no injunction shall issue unless complainant has made every reasonable attempt to settle the dispute—including negotiation, government-sponsored mediation or voluntary arbitration.

Section 13, 29 U.S.C.A. § 113, contains definitions:

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have a direct or indirect interest therein; * * * or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; * * * or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).
* * * * *

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the

association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relationship of employer and employee."

56. Preliminarily, it should be noted that the Act does not apply to all circumstances in which, on its face, it might be thought to apply. We know that injunctions have been upheld which were issued (1) to compel arbitration, Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); (2) to enjoin a strike by a railway union over "minor disputes" cognizable by the Railroad Adjustment Board, see Brotherhood of Railroad Trainmen v. Chicago River & Indiana RR, 353 U.S. 30, 39–42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); (3) to compel an employer to bargain with a certified union, Virginian Ry. v. System Federation, 300 U.S. 515, 562–563, 57 S.Ct. 592, 81 L.Ed. 789 (1937); and (4) to compel a union to perform its statutory duty of fair representation, Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 237–240, 70 S.Ct. 14, 94 L.Ed. 22 (1949); Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955).

57. In the recent case of Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 212, 82 S.Ct. 1328, 1338, 8 L.Ed.2d 440 (1962), the Court distinguished the situation involving an injunction directed *against* a strike, in violation of a no-strike clause, from Lincoln Mills on the grounds that

arbitration. It was held, moreover, that there was no policy justification "for restricting § 301(a) to damage suits, leaving specific performance of a contract to arbitrate grievance disputes to the inapposite procedural requirements [of § 7] of that [Norris-LaGuardia] Act." 353 U.S. at 458, 77 S.Ct. at 918.

The injunctive relief sought by Local 28—restoration of its charter, etc.—may also be said not to be "a part and parcel of the abuses against which the Act," as indicated by the specific matters listed in section 4, was directed. 353 U.S. at 458, 77 S.Ct. at 918. Here, likewise, the injunction sought would not have the proximate effect of *prohibit[ing]* any person or persons participating or interested in such dispute * * * *from doing* * * * any of the" acts listed in section 4. (29 U.S.C.A. § 104—emphasis added.)

The crucial question remaining is whether the Local's case involved a "labor dispute" as defined in section 13(c) and used in section 7. If so, that section's procedural requirements precedent to the issuance of an injunction were not met in this case and the injunction should not have been granted. There is little doubt that at its root this controversy is concerned with a "labor dispute" as literally defined by section 13 of the Act. But this case is no more directly concerned with what is a "labor dispute" than was Lincoln Mills, yet there the Court held that:

"Though a literal reading might bring the dispute within the terms of the Act [citation omitted], we see no justification in policy for restricting § 301(a) to damage suits, leaving specific performance of a contract to arbitrate grievance disputes to the inapposite procedural requirements of that Act." 353 U.S. at 458, 77 S.Ct. at 918.

in Lincoln Mills "—a mandatory injunction to carry out an agreement to arbitrate—did not enjoin any one of the kinds of conduct which the specific prohibitions of the Norris-LaGuardia Act withdrew from the injunctive powers of United States courts."

See also, Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 212, 82 S.Ct. 1328, 8 L.Ed.2d 440; id. at 219, 82 S.Ct. at 1341 (Justice Brennan's formulation to the same effect).

Of course, in its decision the Court also relied on its view that there is a clear congressional policy favoring enforcement of agreements to arbitrate grievance disputes. It cannot be said with complete confidence that there is similarly a clear congressional policy favoring federal court enforcement of inter-union contracts of the character at issue in the Local 28 case. But, if it is held (see p. 914 supra) that Congress by section 301(a) did confer upon federal courts jurisdiction over such suits, it would be as inappropriate here as it would have been in Lincoln Mills to insist upon the stringent procedural requirements of section 7 when manifestly the matter here enjoined "was not a part and parcel of the abuses against which the Act was aimed." 353 U.S. at 458, 77 S.Ct. at 918.

*Pre-emption and Primary Jurisdiction Problems in the Local's Suit*

The defendant further contends that the complaint of Local 28 involves matters arguably subject to § 7 or § 8 of the NLRA, 29 U.S.C.A. §§ 157 and 158, and is therefore, under San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), subject to the Labor Board's exclusive primary jurisdiction. Although phases of the Local's case involve an alleged breach of the IBEW Constitution, defendant argues that the case is also arguably concerned with unfair labor practices. And because the same basic facts and contentions provide the foundation of both types of possible actions, the defendant argues that the District Judge, despite his efforts, could not separate the various elements of the case.[58]

58. The District Court held that it was not required wholly to yield to the jurisdiction of the Labor Board. Specifically the court held that it had no jurisdiction in Local 28's case "to decide whether the Maryland Chapter failed to bargain in good faith," 203 F.Supp. at 293, or wheth-

Recently the Supreme Court held that in cases under the "between an employer and a labor organization" clause of section 301 the pre-emption doctrine of Garmon is not relevant, regardless of whether the employer's conduct is arguably or concededly an unfair labor practice within the Labor Board's jurisdiction.[59] Since we have reached the conclusion that the District Court had jurisdiction over this suit under section 301(a), we think it not inappropriate to conclude further that the teaching of these decisions is applicable here.[60] Cf., United Textile Workers v. Textile Workers Union, 258 F.2d 743 (7th Cir., 1958); Local 33, International Hod Carriers Union v. Mason Tenders District Council, 291 F.2d 496, 502–505 (2d Cir., 1961).

While it is very possible that some of the facts may be invoked as the basis for

both types of controversies, this does not mean that the District Court in an appropriate case must yield the full·measure of its jurisdiction and await the Board's determinations. At most, the court must merely avoid "affect[ing] the jurisdiction of the N.L.R.B. to remedy unfair labor practices, as such." [61] The District Court did all that could be required of it by generally avoiding decisions tantamount to findings and conclusions as to whether or not unfair labor practices had been committed.

### Parks: Cause of Action

■ As to the Parks case the International argues that it should have been dismissed for failure to state a claim entitling the plaintiffs to relief under §§ 101(a) and 609 of the LMRDA, 29 U.S. C.A. §§ 411(a) and 529.[62] To resolve

er the IBEW "conspired with and encouraged the Maryland Chapter not to bargain fairly," id. at 293, or whether "the International attempted to coerce the members of Local 28 in the exercise of the rights protected by sec. 7 * * *." Id. at 293 n. 11.

59. Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); see Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 513, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962); Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 101 n. 9, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Atkinson v. Sinclair Refining Co., 370 U. S. 238, 245 n. 5, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962); see also Textile Workers v. Arista Mills Co., 193 F.2d 529, 533 (4th Cir., 1951).

60. The recent Supreme Court decisions involved the "between an employer and a labor organization" clause; it is therefore necessary to review the policy considerations that justify applying the Smith rule to the "between any such labor organizations" clause of § 301(a).
First, it is clear that Congress did not mean to authorize the Labor Board to concern itself generally with matters of internal union discipline and structure. See n. 49, supra; see also, e. g., International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).
Second, there can be no doubt that, just as the enforcement of collective bargaining agreements has been left to the courts,

see Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 513, 82 S.Ct. 519, 7 L.Ed. 2d 483 (1962), most matters directly concerning internal union activities, insofar as they are regulated at all, have been left to the courts. See Gonzales, supra; Bussey v. Plumbers Local No. 3, 286 F.2d 165 (10th Cir., 1961); Rekant v. Shochtay-Gasos Union, Local 446, 205 F.Supp. 284, 291–292 (E.D.Pa.1962); Robertson v. Banana Handlers, Intern. Longshoremen's Ass'n, Local 1800, 183 F.Supp. 423, 425–426 (E.D.Louisiana 1960); see also, Highway Truck Drivers Local 107 v. Cohen, 182 F.Supp. 608, 617 (E.D.Pa.), aff'd per curiam, 284 F.2d 162 (3d Cir., 1960), cert. denied, 365 U.S. 833, 81 S. Ct. 747, 5 L.Ed.2d 744 (1961) (implied).

61. Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 101 n. 9, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962); cf., Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
In Smith v. Evening News Ass'n, 371 U.S. 195, 197–198, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962), the Court stated that "[i]f * * * there are situations in which serious problems will arise from both the courts and the Board having jurisdiction over acts which amount to an unfair labor practice, we shall face those cases when they arise."

62. This, of course, is not strictly a jurisdictional challenge but rather an attack on the merits. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939

this question it is necessary to determine whether the order of revocation "otherwise disciplined" the Local's members within the meaning of sections 101(a)(5) [63] and 609.[64] So far as we can determine, this question is one of first impression. The phrase, "otherwise disciplined," is not defined in the statute and a review of the legislative history has not revealed any particular meaning attached to it by Congress. Finally, there have been few decisions construing this phrase,[65] except as it may relate to the removal of officers.[66]

We are disposed to the view that the plaintiffs have stated claims under the Act. While it is true that the revocation order directly affects only Local 28, not the individual plaintiffs, it would seem unduly technical to say that if the revocation were invalid and indirectly resulted in injury to these individuals, they may not be heard to complain under the LMRDA. On this point there are some helpful precedents in the state courts. At common law, examining the practical effect of revocation or suspension of a local's charter, they appear to have taken the position that such action disciplines the local's members.[67] And, in the absence of a clear congressional purpose to the contrary, in construing the Labor Reform Statute we cannot disregard the practical impact of this revocation on the individual members.

In the present case, the IP's order does affect the individuals in their status as members of the union.[68] That is, al-

(1946). Jurisdiction over this cause is founded on § 102 of the LMRDA, 29 U.S.C.A. § 412, which provides that:

"Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

Section 609, 29 U.S.C.A. § 529, provides that:

"The provisions of section 412 of this title shall be applicable in enforcement of this section."

63. "No member of any labor organization may be fined, suspended, expelled, or *otherwise disciplined* except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." (Emphasis added.)

64. "It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or *otherwise discipline* any of its members for exercising any right to which he is entitled under the provisions of this chapter. * * *" (Emphasis added.)

65. Cases in which it was held that the plaintiffs were "otherwise disciplined": Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir.), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed. 2d 388 (1961), reversing on other grounds, 189 F.Supp. 573 (S.D.N.Y.1960); Rekant v. Shochtay-Gasos Union, 194 F.Supp. 187 (E.D.Pa.1961); 205 F.Supp. 284, 289 (E.D.Pa.1962); Deluhery v. Marine Cooks Union, 199 F.Supp. 270, 273 (S.D.Cal.1961); Gross v. Kennedy, 183 F.Supp. 750, 755–756 (S.D.N.Y.1960).

Cases in which it was held that the plaintiffs were not "otherwise disciplined": Seeley v. Brotherhood of Painters, 308 F.2d 52, 58–60 (5th Cir., 1962); Allen v. Armored Car Chauffeurs Local 820, 185 F.Supp. 492 (D.N.J.1960).

66. See, e.g., Sheridan v. United Brotherhood of Carpenters, 191 F.Supp. 347, 352–353, 194 F.Supp. 664, 668 (D.Del. 1961), reversed, 306 F.2d 152, 156–157 (3d Cir., 1962) (only Kalodner, J. for reversing on this ground); Mamula v. Local 1211, United Steelworkers, 202 F.Supp. 348 (W.D.Pa.1962).

67. See Moore v. Moreschi, 179 Misc. 475, 485, 39 N.Y.S.2d 208, 216, aff'd without opinion, 265 App.Div. 989, 40 N.Y.S.2d 334, aff'd with modifications as to scope of injunction, 291 N.Y. 81, 50 N.E.2d 552, modified according to mandate, 182 Misc. 264, 44 N.Y.S.2d 402 (1943); see also Washington Local Lodge No. 104, etc. v. International Brotherhood of Boilermakers, 33 Wash.2d 1, 68–71, 74–75, 203 P.2d 1019, 1058–1059, 1061 (1949); Hatch v. Grand Lodge Brotherhood of Railroad Trainmen, 233 Ill.App. 495 (1924); Gardner v. Newbert, 74 Ind.App. 183, 128 N.E. 704 (1920).

68. This is undoubtedly a factor for consideration in determining whether challenged action constitutes "other disci-

though there is some uncertainty as to how the members' rights in the various local and international pension and welfare funds will be affected, there can be little doubt that the revocation order does touch these rights. In addition, as a proximate result of the International's action, members of Local 28 have suffered a loss of employment opportunities.[69]

In alleging that by revoking the Local's charter the IP "suspended, expelled, or otherwise disciplined" the members without a full and fair hearing, the plaintiffs stated a claim under section 101(a) (5).[70] They also made sufficient allegations to state a claim that by revoking the Local's charter the IP acted, in violation of section 609, to "suspend, expel, or otherwise discipline" the members for exercising rights to which they were entitled under the provisions of the LMRDA—specifically the right to bring suit guaranteed by section 101(a) (4). The plaintiffs' failure was in the proof of their claims.

*Possible Conflict Between Parks Action and NLRB Jurisdiction*

■ Another jurisdictional point advanced by the IBEW is that the District Court was required, even in the Parks action, which is based upon the Bill of Rights provisions (Title I) and § 609 of

the LMRDA, to defer to the exclusive primary jurisdiction of the Labor Board, because at least elements of the case are arguably subject to § 7 or § 8 of the NLRA. See San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244–245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The District Court was entirely correct in declaring this challenge to its jurisdiction "unavailing."

The LMRDA has created new federal rights to be enjoyed by union members.[71] These rights are to be enforced in the federal courts. See § 102 of the LMRDA, 29 U.S.C.A. § 412; Detroy v. American Guild of Variety Artists, supra. The fact that the Act preserves to union members all remedies "under any State or Federal law or before any court or other tribunal * * *," § 103 of the LMRDA, 29 U.S.C.A. § 413; see also § 603(a), 29 U.S.C.A. § 523(a), only means that the new federal protection was superimposed on protection already available in other forums, "reinforcing and not supplanting it." Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J. 175, 176 (1960). This does not mean that the District Court must abstain from exercising its jurisdiction under section 102 when elements of the matter at issue are arguably subject to the Labor Board's jurisdiction.[72] Congress did not

pline." See, e. g., Seeley v. Brotherhood of Painters, 308 F.2d 52, 58–60 (5th Cir., 1962).

69. This is also a relevant factor. See Detroy v. American Guild of Variety Artists, supra; Rekant v. Shochtay-Gasos Union, supra; Gross v. Kennedy, supra; but cf., Allen v. Armored Car Chauffeurs Local 820, supra.

70. It would appear that, regarding this section, the District Court based its decision in part upon the conclusion that the hearing was unfair not only procedurally but also in that the IP had breached his fiduciary obligation and had imposed an unduly severe sanction—thus, the court has read substantive guarantees into the "fair hearing" requirement. See Union Trusteeships: A Report to the Congress, U.S. Dep't of Labor, BLMR (1962) 131; Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460,

1482 (1962). Having held, on the merits, that the IP neither breached his fiduciary obligation nor imposed an unduly severe sanction, this court will reserve judgment on the mooted question of whether § 101(a) (5) protects substantive or merely procedural rights.

71. See Detroy v. American Guild of Variety Artists, 286 F.2d 75, 78 (2d Cir.), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); Rekant v. Shochtay-Gasos Union, Local 446, 205 F.Supp. 284, 291–292 (E.D.Pa.1962); Robertson v. Banana Handlers, Intern. Longshoremen's Ass'n, Local 1800, 183 F.Supp. 423 (E.D.Louisiana 1960).

72. See Rekant v. Shochtay-Gasos Union, Local 446, 205 F.Supp. 284, 290–292 (E. D.Pa.1962); Robertson v. Banana Handlers, Intern. Longshoremen's Ass'n, Local 1800, 183 F.Supp. 423 (E.D.Louisiana, 1960); cf., International Association of

intend that before securing the rights it made enforceable in federal courts, individuals should wait for the Labor Board to pass upon such matters as might also be within its competence.[73]

Obviously, since § 102 of the LMRDA, 29 U.S.C.A. § 412, expressly provides that relief may include injunctions, the provisions of the Norris-LaGuardia Act are inapplicable.

*Title III of the LMRDA—Trusteeships*

The plaintiffs assert that by revoking and reissuing the charter conveying IBEW jurisdiction in the Baltimore area, the IP achieved the same objectives as he might have attained through a formal trusteeship and his action should therefore be held to have constituted the imposition of a trusteeship.[74] So denominating the IP's action, the plaintiffs reason that the trusteeship provisions of the LMRDA have been violated.[75]

Preliminarily, a question to be determined is whether the District Court was empowered to exercise jurisdiction over this private action for alleged violations of Title III of the LMRDA. The jurisdictional provision of Title III, § 304(a), 29 U.S.C.A. § 464(a), provides that:

"Upon the written complaint of any member or subordinate body of a labor organization alleging that such organization has violated the provisions of this title (except section 461 of this title) the Secretary shall investigate the complaint and if the Secretary finds probable cause to believe that such violation has occurred and has not been remedied he shall, without disclosing the idenity of the complainant, bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate. Any member or subordinate body of a labor organization affected by any violation of this subchapter (except section 461 of this title) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate."

Several district courts have interpreted this to mean that individual members or subordinate bodies may not bring a civil action until full resort has been had to the administrative remedies available before the Secretary of Labor.[76] In a litigation involving Local 28 and the IBEW, prior but pertinent to the present one, District Judge R. Dorsey Watkins

Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958); Bussey v. Plumbers Local No. 3, 286 F.2d 165 (10th Cir., 1961); Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). And in our own circuit, cf., Textile Workers v. Arista Mills Co., 193 F.2d 529, 533 (4th Cir., 1951).

73. See Robertson v. Banana Handlers, Intern. Longshoremen's Ass'n, Local 1800, supra; cf., Rekant v. Shochtay-Gasos Union, Local 446, supra; International Association of Machinists v. Gonzales, supra; Bussey v. Plumbers Local No. 3, supra,

74. Section 3(h) of the LMRDA defines a trusteeship as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available

to a subordinate body under its constitution or bylaws." 29 U.S.C.A. § 402(h).

75. Section 302, 29 U.S.C.A. § 462, limits the lawful reasons for which a trusteeship may be imposed. Section 304(c), 29 U.S.C.A. § 464(c), provides that a trusteeship will be presumed valid for a period of eighteen months only if "established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws * * *."

76. See Flaherty v. McDonald, 183 F.Supp. 300, 304–306 (S.D.Cal.1960); Flaherty v. United Steelworkers, 46 L.R.R.M. 2483, 3006, 41 L.C., par. 16,517 (S.D.Cal.1960); Cox v. Hutcheson, 204 F.Supp. 442, 446 (S.D.Ind.1962); Rizzo v. Ammond, 182 F.Supp. 456, 471–472 (D.N.J.1960).

had occasion to pass upon this very question. After a scholarly analysis, he concluded that, at least until the Secretary of Labor does bring suit, a private action can be maintained under § 304(a) of the LMRDA. Executive Board, Local 28 IBEW v. IBEW, 184 F.Supp. 649, 653–659 (D.Md.1960).[77] In this well reasoned view that section 304(a) does not require recourse to that particular administrative remedy and action of the Secretary before a private suit may be entertained, this court concurs.

■ Upon review of the evidence, however, Judge Thomsen concluded that while it is possible for revocation to be used as a means of evading the trusteeship provisions of Title III, it was not proven that revocation was so used.[78] Although the question is exceedingly close, see Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1478–85 (1962), this court is not persuaded that the District Court's disposition of the trusteeship question should be overturned.

### Exhaustion of Internal Remedies—in Both Suits

■ The defendant maintains that both actions should have been dismissed because the plaintiffs failed to exhaust the reasonable internal remedies that were available to them. Having filed their suits over a year ago, both Local 28 and the individual plaintiffs failed to appeal to the International Convention which met this past September after the appeal in this case was argued. In addition, the individual plaintiffs in the Parks suit never did appeal to the IEC from the IP's revocation order.[79]

■ We think that the individual plaintiffs need not have been actual parties to the proceeding before the IEC. They were not themselves direct parties to the revocation order or proceedings and, since the two cases, Local 28's and Parks', are based upon a common foundation, Local 28's appeal to the IEC preserved the rights of the individuals who now challenge the revocation order.

Plaintiffs' failure to appeal to the Convention did not bar disposition of the cases by the District Court. Although there is a common law doctrine that parties are not entitled to judicial relief until they have exhausted intra-union remedies, there are a number of well-recognized exceptions "which have substantially qualified if not nullified the rule."[80] Exceptions are recognized when resort

---

77. Accord, Vars v. International Bhd. of Boilermakers, 204 F.Supp. 245, 246–247 (D.Conn.1962); see Palisades Lodge No. 173 v. Brotherhood of Railway Clerks, 214 F.Supp. 768 (S.D.N.Y.1960) (by implication); see also, Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1498–1500 (1962). Note, 48 Va.L.Rev. 78, 96–97 (1962).

78. At least two commentators appear to agree that revocation and reissuance of a charter should, at least under some circumstances, be held to constitute the imposition of a trusteeship. See Horowitz, "Possible Effects of LMRDA's Provisions," in Symposium on the Labor-Management Reporting and Disclosure Act of 1959 (1961), edited by Slovenko, 458, 563; Anderson, "Landrum-Griffin and the Trusteeship Imbroglio," 71 Yale L.J. 1460, 1478–85 (1962). The Department of Labor adopted the position:

"that a revocation of a charter, properly conducted and in accordance with a labor organization's constitution and by-laws, does not create a trusteeship. * * * The Department has also determined that nothing in the Act prevents the creation of a new local, even though it may be composed primarily of the same individuals. formerly belonging to the trusteed local that had its charter revoked." Union Trusteeships: A Report to the Congress,. U.S. Dept. of Labor, BLMR (1962) 33–34.

79. In the earlier injunction proceeding brought by Local 28, Judge Thomsen denied relief since the Local had not pursued the available internal remedy before the IEC. Local 28 IBEW v. IBEW, 197 F. Supp. 99, 107–108 (D.Md.1961).

80. Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049, 1086 (1951); accord, Detroy v. American Guild of Variety Artists, 286 F.2d 75, 79 (2d Cir.), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); see also, Cox, "The Role of Law in Preserving Union Democracy," 72 Harv.L.Rev. 609, 614–615 (1959).

to the internal appeal would be unreasonably burdensome because of delay likely to result in irreparable injury.[81]

In addition to the common law doctrine, as qualified by its exceptions, there is now § 101(a) (4) of the LMRDA, 29 U.S.C.A. § 411(a) (4).[82] The Second Circuit has squarely held that the proviso in section 101(a) (4) is applicable as a limitation on jurisdiction in suits brought in the federal courts under section 102 for violations of Title I of the LMRDA. Detroy v. American Guild of Variety Artists, 286 F.2d 75, 77–78 (2d Cir.), cert. denied, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961). Not only does section 101(a) (4) govern the exhaustion question in the Parks action, but since it provides an authoritative expression of congressional labor policy, it is, insofar as it may modify the common law exhaustion doctrine, a prime source upon which the court should draw in formulating the federal law in deciding the Local's case. See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456–457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

The four-month limitation in the proviso has been subjected to various interpretations.[83] We agree, however, with the District Court's conclusion that "whatever construction is placed" on this proviso (203 F.Supp. at 296), these suits are barred neither by the statutory limitation nor by common law exhaustion doctrine. When these suits were brought, all internal remedies, available within four months of revocation, had

been exhausted. To insist upon full exhaustion of remedies would be to impose an unreasonable delay in the adjudication of plaintiffs' rights and would result in irreparable harm to plaintiffs.[84]

## CONCLUSION

Parent unions have played a useful role in bringing a measure of order and stability to the labor market. Perhaps their best contribution has been in restraining their component bodies from reckless resort to work-stoppages and strikes. If in some quarters abuses have arisen that require correction, there should be legislation. But courts should not step in and, in order to achieve immediate objectives thought to be desirable, establish a rule that locals may with impunity defy their parent unions and strike at will. By the judicial application of *ad hoc* standards, in the pursuit of what is called democracy in union government, we will have succeeded only in introducing, not democracy, but chaos. This would not only tend to disintegrate the labor movement, but the irresponsibility thus generated could have serious implications for employers and others as well.

We conclude that while the consolidated cases are within the court's jurisdiction, there was no sufficient basis for holding that the IBEW or its IP breached a fiduciary obligation to Local 28 or its members, or that the hearing was lacking in fairness, or that revocation was an unduly severe sanction. The Local's claim based on breach of con-

81. Summers, "Legal Limitations on Union Discipline," 64 Harv.L.Rev. 1049, 1086–92 (1951) ; Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J., 175, 207–210 (1960) ; Annotation, 168 A.L.R. 1462, 1468–1482 (1947).

82. "No labor organization shall limit the right of any member thereof to institute an action in any court, or in proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, * * * *Provided*, That any such member may be required to exhaust

reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof * * *."

83. E. g., compare Detroy, supra, with Harris v. International Longshoremen's Ass'n, Local 1291, 205 F.Supp. 45 (E.D.Pa. 1962).

84. See Summers, "The Law of Union Discipline: What the Courts Do in Fact," 70 Yale L.J. 175, 208 (1960) ; see also Cox, "The Role of Law in Preserving Union Democracy," 72 Harv.L.Rev. 609, 614 (1959).

tract under the Taft-Hartley Act therefore fails and the charter revocation did not violate the members' rights under §§ 101(a) and 609 of the LMRDA, 29 U.S.C.A. §§ 411(a) and 529.

We are not unmindful that the interests of the members of Local 28 in the various local and international pension and benefit funds have been made uncertain by the revocation. Whether the International or the Local has title to the Local's funds and other assets was not litigated in these cases and we do not pass upon this.[85] We note, however, that the revocation order anticipated the International's taking steps to assure that the members of Local 28 will not suffer unnecessary loss of financial benefits. Moreover, there is no indication that the rank and file members of the outcast local will be unable to preserve their memberships in the IBEW by accepting the invitation extended them to join Local 24 or by transferring to some other local.

The District Court's decision must for the reasons stated be reversed, and the case is remanded for further orders consistent with this opinion.[86]

Reversed and remanded.

SOPER, Circuit Judge (dissenting).

The power of the District Court to entertain these suits is clearly demonstrated in the concluding portion of the court's opinion, and with this conclusion I concur. However, the ultimate conclusion of the court, reversing the judgment of the District Court, involves an endorsement and approval of the conduct of Freeman, the all-powerful president of the IBEW, in trying and punishing Local 28 and its members, and with this conclusion I am obliged to dissent, since the behavior of the IP was plainly at variance with established principles of due process and fair play. The opinion embraces the theory that "basic union policy and structure" require that the dominant power be lodged in the parent body and pursues this theme so steadily in the course of an elaborate discussion that in the end little head is given to the arbitrary manner in which the IP exercised his power.

A brief résumé of the conduct of the IP, based upon undisputed evidence, demonstrates to my mind that the District Court was correct in finding that the local union and its members were denied their fundamental rights. The IP was a stern and resolute individual, determined to have his own way not only when he was executing the powers conferred upon him by the constitution of the IBEW but also in those areas in which the local union members were entitled to some freedom of choice. His attitude toward anything that tended to diminish his power is shown by a public statement in a speech in 1961 at the convention of an association of electrical contractors known as NECA. He said that he "hated" the Landrum-Griffin Act. The fact that Congress itself deemed it necessary to formulate a bill of rights for the protection of the individual workers found no favor in his eyes. Accordingly, it is not surprising to learn that the Local had much provocation from the IP himself when it ventured to strike without his consent. The current labor dispute involved two major items—a demand of the workers for an increase in wages of 35 cents an hour in place of an increase of 2 cents an hour offered by NECA, and a determined

---

85. Of possible interest in this connection are Cohn, "The International and the Local Union," 11 N.Y.U.Ann.Conf.Labor 7 (1958); Summers, "Union Schism in Perspective: Flexible Doctrines, Double Standards and Projected Answers," 45 Va.L.Rev. 261 (1959); Note, "Disposition of Union Assets on Disaffiliation," 45 Va.L.Rev. 244 (1959); Annotation, 23 A.L.R.2d 1209 (1952).

86. If this court should be in error in any of these conclusions, we are of the opinion that the order of the District Court still requires revision. While the revocation would be void, the International should, in that event, be given the opportunity to retry the Local before a properly constituted tribunal.

stand by the Local in opposition to the insertion of a "council clause" which would strip the Local of its power to terminate a contract at the end of the year and lodged the power of decision in the CIR.[1] In this dispute the IP promised the Local his support, but in fact he worked in harmony with NECA. He tried hard to persuade the Local to adopt the obnoxious clause and also to accept a raise of 10 cents an hour recommended by the IEC although he was aware that the Local had obtained contracts with a number of independent contractors entitling the workers to an increase in wages of 35 cents per hour. In order to break the strike the IP brought in workers from outside the State, and persuaded union men in other trades not to respect the Local's picket line. The IP was angry with the union because it would not do his bidding and it is obvious that instead of supporting the Local in the dispute he used his weight in support of the employing contractors.

It was in this attitude and under these circumstances that the IP came to judgment. He had the right under the IBEW constitution to institute charges against the Local for striking without his consent and also the right to sit in judgment in the case. He exercised both rights. He appointed a referee to hear the charges preliminarily but reserved to himself the final decision. He had to decide whether he should condemn the Local for striking without his consent and without his orders and what punishment, if any, he should inflict. He was not obliged to hear the case himself since, under the constitution of the International, it could have been referred to the IEC, a body of international officers appointed to govern the union between meetings of the international convention.[2] He knew that he had opposed the working employees and favored NECA in the negotiations that preceded the strike and that his own conduct was one of the matters that should be taken into consideration in deciding the case. Indeed, he was aware that he ought not to sit in the case, for he refused to submit to examination as a witness, saying that he could not be a witness because he had to make the ultimate decision in the case. Nevertheless, he did sit; and again he gave evidence that he was not bound by any rules of fair play, for during the trial he did not hesitate to confer with the prosecuting attorney out of the presence of the attorney for the local union.

In view of this narrative, it is futile to suggest, as does the opinion of the court, that "the real basis for the argument that the IP was biased is that he was, in a sense, both prosecutor and judge." The trier of the cause in an internal union dispute or in an administrative proceeding does not cease to be a judge because he is empowered also to act as proescutor. He may not ignore the established principles of due process in order to obtain his own ends.

It is plain that the IP was not qualified to pass judgment in the case and, particularly, to determine the kind of punishment to be inflicted for violation of the union rules. This is shown not only by what is set forth above but also by the extremely severe punishment which he inflicted upon the local union and its members by revoking the Local's charter, as is shown in the opinion of the District Court. This was the only case in which the IP had refused his consent to a strike by a Local union when it desired to strike in order to maintain its position in a legitimate labor dispute. Not only did the IP withhold his consent to the strike in the instant case, but, when the strike took place against his will, he

---

1. The District Court held in an earlier suit brought by the Local against the Maryland Chapter of NECA, 194 F.Supp. 494, that the Local had the right to terminate the contract at the end of the year; no appeal was taken from the decision.

2. The appeal was taken in this case to the IEC but, as the District Judge pointed out in his opinion, the IEC did not try the case de novo but upon the record made up by the IP.

imposed the severest discipline within his power. Under all these circumstances it is improper to approve the actions of the IP especially in these days when the rights and constitutional safeguards of a person accused of crime and of a person convicted of crime are so meticulously observed. One would suppose that the same protection should be afforded a lawabiding working man even if, in the exercise of his rights of collective bargaining, he exceeds the bounds of propriety. For these reasons and those expressed in the opinion of Judge Thomsen I dissent. See Calabrese v. United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of the United States and Canada, et al., 211 F.Supp. 609 (D.N.J. December 21, 1962).

